**UNITED STATES of America,**

**v.**

**Jaime CASTRO–TIRADO, Defendant.**

**No. 75 CR 811.**

United States District Court,
E. D. New York.

Jan. 26, 1976.

David G. Trager, U. S. Atty., E. D. N. Y., Brooklyn, N. Y., for plaintiff by Paul F. Corcoran, Asst. U. S. Atty., of counsel.

Evseroff & Sonenshine, Brooklyn, N. Y., for defendant by Jacob R. Evseroff, Brooklyn, N. Y., of counsel.

BARTELS, District Judge.

## MEMORANDUM–DECISION AND ORDER

Defendant Jaime Castro-Tirado ("Castro"), an illegal alien, was indicted for violation of 21 U.S.C. § 841(a)(1), in that he did knowingly and intentionally possess with intent to distribute approximately one kilogram of cocaine, a Schedule II narcotic drug controlled substance. He now moves to suppress a quantity of cocaine seized by Immigration and Naturalization Service ("INS") criminal investigators and certain statements made by him to government authorities. A brief statement of the facts is necessary.

Thomas Flood and Lawrence Mulkearns, INS investigators, while assigned to John F. Kennedy Airport ("JFK") to apprehend aliens illegally present in this country, arrested Castro on October 23, 1975, on his arrival at the Trans-World Airline Terminal at JFK. At the time, Castro was disembarking from Flight No. 16 originating in Los Angeles, California, with a stop at Phoenix, Arizona, where Castro had boarded. Flood testified that from the period of March to October 1975, 500 persons were arrested as illegal aliens arriving on flights from Los Angeles to JFK, 300 of whom were personally arrested by him, and of whom 285 were illegal aliens from Mexico and South American countries. When Castro arrived that day Flood became suspicious of his actions and suspected that he was of Hispanic origin. His suspicion was confirmed when he overheard Castro speak Spanish while exiting from the plane and was told by Castro in response to his inquiry that he was from Colombia. Flood thereupon requested Castro to furnish his passport and his alien-registration receipt card for nonimmigrants, Form I–94 (Arrival-Departure Card), required to be kept on his person under 8 U.S.C. § 1304(e), and upon Castro's failure to produce the same, Flood arrested him.

Upon arrest and despite Castro's disclaimer of any baggage, Mulkearns in the course of a search took a baggage check from Castro's person. Both Flood and Mulkearns then retrieved Castro's suitcase at the carousel and took both Castro and the suitcase to INS headquarters, where the suitcase was searched without a warrant, and a quantity of cocaine was discovered therein and seized. At the same time, after *Miranda* warnings, Castro, upon questioning, made certain admissions. Castro contends that neither the admissions nor the contraband are admissible in evidence.

After argument and briefing, Castro admits, as he must, that he was legally arrested since Flood had reason to believe that Castro was an alien not legally present, 8 U.S.C. § 1357(a)(2), and in addition since Castro failed to have on his person the necessary documents establishing a lawful status in this country. 8 U.S.C. § 1304(e). *See United States v. Abrams,* 427 F.2d 86, 91 (2d Cir.), *cert. denied,* 400 U.S. 832, 91 S.Ct. 64, 27 L.Ed.2d 63 (1970); 8 C.F.R. § 264.1 (1975); 2 Gordon and Rosenfield, IMMIGRATION LAW AND PROCEDURE § 6.10d at 6–79 (Rev. ed. 1975).[1]

En route to the INS headquarters Castro admitted to the investigators that he was in this country illegally and was subject to deportation. After the search at the headquarters Castro made certain other inculpatory statements, explaining the presence of the cocaine. He stated that he had, on the instructions of an unidentified man in Jackson Heights, proceeded to Phoenix, Arizona, to a designated motel and bar where he received

---

1. Castro argues that since he informed Flood that both documents were at his home, there was no basis for the arrest. Flood testified, however, that it had been his experience that in 50% of the occasions when such statements were made by illegally present aliens such documents did not exist. It so happened in this case that the documents were delivered to INS, though not until after the government obtained the items here sought to be suppressed.

a plastic bag of white powder, which he knew to be narcotics, from an unknown person who recognized him by his blue jacket and white pants, an agreed upon outfit. According to the plan he was to return to New York, deliver the plastic bag to the unidentified man, and receive $1,000. Although Castro refused to sign an INS form in Spanish waiving his right against self incrimination and his right to have an attorney present,[2] there is no question that after hearing his *Miranda* warnings given more than once Castro spoke voluntarily without any violation of his constitutional rights.

The crucial question here involved is whether the INS had a legal basis to search the suitcase following the arrest. Although Castro, on the way to headquarters, admitted that he was present illegally in the country, we note that the suitcase was not searched on arrival at 6:30 A.M. but later at headquarters at 10 A.M., which was before Castro's passport and registration card were delivered to INS, and also before Castro made any of the statements sought to be suppressed.

■■■ We are reminded by Mr. Justice Frankfurter that deportation proceedings do not warrant the same constitutional safeguards as those required in criminal prosecutions. He stated in *Abel v. United States,* 362 U.S. 217, 237, 80 S.Ct. 683, 696, 4 L.Ed.2d 668 (1960):

"According to the uniform decisions of this Court deportation proceedings are not subject to the constitutional safeguards for criminal prosecutions. Searches for evidence of crime present situations demanding the greatest, not the least, restraint upon the Government's intrusion into privacy; although its protection is not limited to them, it was at these searches which

the Fourth Amendment was primarily directed. We conclude, therefore, that government officers who effect a deportation arrest have a right of incidental search analogous to the search permitted criminal law-enforcement officers."

Here, Castro was arrested for deportation reasons, and the subsequent search was conducted, not to secure evidence of other crimes,[3] but to inventory and safeguard the bag's contents against future claims, to discover any dangerous materials[4] and to determine whether Castro was entitled to remain in the country. Legitimate caretaking and inventory searches, conducted without a warrant, have been approved by the Supreme Court, *Cady v. Dombrowski,* 413 U.S. 433, 441–48, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968), and were fully articulated in *United States v. Lipscomb,* 435 F.2d 795, 800 (5th Cir. 1970), *cert. denied,* 401 U.S. 980, 91 S.Ct. 1213, 28 L.Ed.2d 331 (1971), where it was said:

"It can not be denied that to prevent escape, self-injury, or harm to others, the police have a legitimate interest in separating the accused from the property found in his possession. An inventory is then necessary both to preserve the property of the accused while he is in jail and to forestall the possibility that the accused may later claim that some item has not been returned to him."

*See also United States v. Edwards,* 415 U.S. 800, 802–03, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974).

■■■ Additionally, the INS may properly search the detainee's possessions to determine his legal presence in the

---

**2.** An INS investigator indicated on the form that "Subject refused to sign wants to spk w/an attorney first".

**3.** Indeed, the arresting INS investigators had no suspicion that Castro was involved in any other wrongdoing.

**4.** Mulkearns testified that it has long been the established practice of the INS after the appre-

hension of an illegal alien who is to be detained to search his bags for weapons and other dangerous or destructive material before transferring him to the detention quarters in order to protect not only the agents and law enforcement officers, but also the other detainees, inasmuch as all such detainees are given access to their possessions pending final disposition of their cases.

country, *Abel v. United States, supra,* 362 U.S. at 235–39, 80 S.Ct. 683, and such a warrantless search may be conducted at the place of detention after a proper arrest. *See United States v. Edwards, supra,* 415 U.S. at 803, 94 S.Ct. 1234; *Abel v. United States, supra,* 362 U.S. at 239, 80 S.Ct. 683; *United States v. Gardner,* 480 F.2d 929, 931 (10th Cir.), *cert. denied,* 414 U.S. 977, 94 S.Ct. 297, 38 L.Ed.2d 220 (1973). The INS search and seizure of baggage in the factual context of this case is supported by many authorities.[5] *See United States v. Grill,* 484 F.2d 990, 991–92 (5th Cir. 1973), *cert. denied,* 416 U.S. 989, 94 S.Ct. 2396, 40 L.Ed.2d 767 (1974) (Warrantless search approved of defendant's suitcase to inventory contents and to determine presence of explosive devices prior to storage for safekeeping); *United States v. Mehciz,* 437 F.2d 145, 147 (9th Cir.), *cert. denied,* 402 U.S. 974, 91 S.Ct. 1663, 29 L.Ed.2d 139 (1971) (Warrant not necessary to search suitcase taken from arrestee's possession though he had been handcuffed and suitcase was not then within his immediate control); *Piva v. United States,* 387 F.2d 609, 610 (1st Cir. 1967) (Search of luggage in apartment for guns approved as attendant upon an arrest of defendants emerging from apartment); *Evalt v. United States,* 382 F.2d 424, 427 (9th Cir. 1967) (Packsack in defendant's possession at time of arrest validly seized by the sheriff, and subsequent warrantless search by federal officer approved). Accordingly, we find that the search of Castro's suitcase and the seizure of the cocaine do not violate the mandate of the Fourth Amendment.

Defendant's motion to suppress is denied in all respects. So ordered.

---

5. Castro cites obiter dictum in *United States v. Coll,* 357 F.Supp. 333, 336 (D.Puerto Rico 1973), for the proposition that a search warrant must be obtained if the defendant acknowledges ownership of the suitcase. We do not subscribe to this dictum.