**UNITED STATES of America**

v.

**Joseph M. TAIBE.**

**No. 77–CR–512.**

United States District Court,
E. D. New York.

March 17, 1978.

David G. Trager, U. S. Atty., E.D.N.Y. by Lawrence Zweifach, Asst. U. S. Atty., Brooklyn, N. Y., for United States.

Martin Light, Brooklyn, N. Y., for defendant.

## MEMORANDUM AND ORDER

COSTANTINO, District Judge.

The defendant, Joseph Taibe, is charged with possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Taibe moves to suppress the physical evidence seized from him at the time of his arrest on August 24, 1977. A suppression hearing was held and the following facts were established.

At approximately 3:00 p. m. on August 24, 1977, Drug Enforcement Administration ("DEA") Special Agents John Huber, Robert Sears, and Louis Miranda had occasion to review a DEA airport log entry which informed them that Joseph Taibe would be arriving at John F. Kennedy International Airport aboard United Airlines Flight 40 from Fairbanks, Alaska at approximately 4:30 p. m. Flight 40 had made a stop-over in Seattle, Washington enroute to New York. A security check at the Seattle Airport revealed that Taibe was carrying approximately $30,000 in cash and was travelling with an airline ticket issued to John Melli. The agents also reviewed a DEA computer print-out which indicated that Taibe was identified by the DEA as a drug trafficking suspect.

At approximately 4:45 p. m. the three agents initiated a surveillance of Taibe. He was observed deplaning and proceeding to the waiting area where he was met by Michael Tullo. After a brief conversation, Taibe gave Tullo his baggage claim ticket. The two men took separate escalators, riding parallel to each other toward the baggage area. Once the baggage area, Tullo went to the baggage carousel and retrieved Taibe's suitcase, while Taibe, followed by Agent Miranda, exited the terminal and entered the airport parking lot.

Tullo, followed by Agents Huber and Sears, then exited the terminal with Taibe's suitcase. He met Taibe in the parking lot and both men proceeded to Tullo's parked automobile. Tullo placed Taibe's suitcase in the back seat of the automobile behind the driver's seat. Tullo seated himself in the driver's seat while Taibe occupied the front passenger's seat.

Agents Huber and Sears approached Tullo's vehicle at the passenger's side while Agent Miranda approached the vehicle at the driver's side. At the time of the approach, the windows of the vehicle were raised, the doors were locked, and the engine was not running. The agents identified themselves, displayed their credentials, and asked the occupants to get out of the automobile. For some moments Taibe and Tullo did not exit the automobile. Agent Huber testified that they appeared confused during this time period. Agent Sears testified that he observed Taibe attempting to stuff his coat under the front seat of the automobile. Agents Miranda and Sears then drew their revolvers. Agent Sears attempted to open the door to the vehicle, discovered it was locked, and banged on the window. The agents began shouting for the occupants to get out of the vehicle.

Taibe and Tullo exited the automobile. They were searched for weapons and asked to show identification. Agent Huber asked Taibe for permission to look through his suitcase. Taibe gave his consent to such a search. Agent Sears informed Agent Huber that he had seen Taibe attempt to stuff

his coat under the front seat of the car. Agent Huber went to the open door on the passenger side of the vehicle, reached for Taibe's suitcase which was on the rear seat on the driver's side, and brought it to the front seat of the car. He picked up Taibe's jacket from the floor of the car near the front seat and as he was doing so a handkerchief and a bag containing white powder fell out of the left-hand side pocket of the jacket and onto the sill of the car door. Agent Huber asked Taibe if he knew what was in the bag. Taibe said he did not know. Agent Huber placed the jacket on the front seat and brought the suitcase to the trunk area where it was searched.

Agent Huber found a brown paper bag in the suitcase. Inside the paper bag was a clear plastic bag containing white powder which was later found to be lactose. Agent Huber also found a box with the words "Drug and Narcotics Identification Kit" written on it. At this point, Taibe was given his *Miranda* warnings. He and Tullo were asked if they would accompany the agents to the DEA office and they agreed to do so. Neither Taibe nor Tullo were placed under arrest at this time. Agent Huber took the suitcase, jacket, handkerchief, and bag of white powder, and locked the door to the automobile, giving the keys to Tullo.

Taibe, Tullo, and the agents proceeded to the DEA office. At the office, Agent Huber performed a field test on the powder that had fallen from Taibe's jacket and determined that the substance was cocaine. Taibe and Tullo were placed under arrest and given their *Miranda* warnings. Agent Huber asked Taibe's consent to search his suitcase again, advising Taibe that a search warrant could be obtained to search his baggage in any event. Taibe agreed to a second search of the suitcase which led to the discovery of two razor blades, a mirror, a small spoon, and a plastic tube labeled "quality tester, diometer,"—"coke", in addition to the bag containing lactose and the narcotics identification kit. Taibe's jacket was also searched and approximately $42,-000 in cash was found.

Defendant Taibe propounds two arguments in support of his motion to suppress the physical evidence seized from him. First, he asserts that the DEA agents lacked probable cause to stop him for investigative purposes and that, therefore, the subsequent search was improper. Second, defendant argues that assuming the agents were justified in stopping him, he did not freely and voluntarily consent to the search of his suitcase and jacket which led to the discovery of the cocaine in his possession.

The government argues that there was reasonable suspicion to justify the limited investigative stop of the defendant, that the defendant voluntarily consented to the search of his suitcase, and that in the course of the suitcase search the cocaine which fell from the defendant's jacket inadvertently came within the "plain view" of Agent Huber. The government also offers two variations of the so-called "inevitable discovery" doctrine to support the validity of the search and seizure in issue. Under the first variation, the government contends that the search of the suitcase, to which the defendant voluntarily consented, established probable cause to search the vehicle. Given the then extant exigent circumstances, a warrantless search of the vehicle was justifiable and the discovery of the cocaine in the defendant's jacket was inevitable. The government's second variation of the "inevitable discovery" doctrine is urged if the court should find that the consent search of the defendant's suitcase was improper. According to this argument, the government claims that there was probable cause to search the vehicle prior to the time Agent Huber entered the vehicle to reach for the defendant's suitcase, and that the seizure of the cocaine was, again, inevitable.

The court turns first to defendant's argument that the DEA agents lacked probable cause to stop him. As the government correctly points out, the Supreme Court, in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), established that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigat-

ing possible criminal behavior even though there is no probable cause to make an arrest." *Id.* at 22, 88 S.Ct. at 1180. *See also Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed. 612 (1972). Police officers are permitted to make brief investigative stops of individuals based on the reasonable suspicion that such individuals are engaged or are about to become engaged in criminal conduct. *United States v. Oates,* 560 F.2d 45, 59 (2d Cir. 1977).

■■■ The proper starting point in analyzing the constitutionality of the conduct of the special agents is to determine whether they are able to point to "specific and articulable facts which, taken together with rational inferences from those facts", reasonably warranted stopping the defendant at the airport parking lot. *Terry v. Ohio, supra* 392 U.S. at 21, 88 S.Ct. 1868. Bearing in mind the observation of the Court of Appeals for the Second Circuit that the test for a reasonable stop is "rather lenient", *United States v. Santana,* 485 F.2d 365, 368 (2d Cir. 1973), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974); *see also United States v. Magda,* 547 F.2d 756, 759 (2d Cir. 1976), the court finds that the original stop of the defendant did not constitute an unreasonable seizure of his person.

■■■ The following "specific and articulable facts", when "viewed through the eyes of a reasonable and cautious police officer, guided by his own experience and training", *United States v. Hall,* 174 U.S.App.D.C. 13,

525 F.2d 857, 859 (1976), were sufficient to justify the stop:[1]

(1) The DEA agents were made aware of the fact that the defendant was a drug trafficking suspect;

(2) The defendant was known to be travelling with a large sum of cash;

(3) The defendant was travelling with an airline ticket in the name of another individual;

(4) The defendant engaged in what could be considered suspicious behavior when he met Tullo at the airport[2];

(5) Narcotics trafficking is a serious offense; and

(6) The suspects were about to depart from the airport, possibly with narcotics, a "readily disposable commodity." *United States v. Oates, supra* at 59, *quoting from United States v. Lampkin,* 464 F.2d 1093, 1097 (3d Cir. 1972). In light of the above factors, the court finds that the initial stop of defendant Taibe was not unreasonable.

■■■ Having found the stop of defendant proper, the court also concludes that "the gravity of the intrusion which the stop entailed", *United States v. Magda, supra* at 758, was not unreasonable under the circumstances. A request for personal identification was a minimal intrusion and a patdown search for weapons was permissible because the DEA agents could reasonably have believed that the suspects were armed and dangerous.[3]

1. The reasonableness of the DEA agents' suspicions must be gauged from their perspective. *United States v. Oates, supra* at 61, and cases cited therein. It is therefore relevant that the three agents have had considerable experience with narcotics investigations. Agent Huber has worked for the DEA for approximately seven years and has participated in two to three hundred airport arrests. Agent Sears has worked for the DEA for seven years and Agent Miranda has two and one-half years experience with the DEA.

2. In view of the fact that the agents were aware that the defendant was a suspected drug trafficker, the fact that he gave his baggage ticket to Tullo, that he and Tullo rode separate escalators and that he exited the airport without his suitcase, which was subsequently retrieved by Tullo, could reasonably be seen as suspicious behavior. In making this determination, the court considers the circumstances at the airport in toto. *See United States v. Oates, supra* at 61, and cases cited therein.

3. First, both suspects had an opportunity to obtain weapons after they entered Tullo's vehicle. Second, the suspects' delay in exiting the vehicle after they had been ordered to do so, taken in conjunction with the defendant's attempt to stuff his jacket under the front seat, warranted the agents' suspicion that criminal activity was afoot and that the suspects might be carrying weapons. The test for reasonable suspicion that an individual is armed and dangerous is not difficult to meet. *United States v. Riggs,* 474 F.2d 699, 705 (2d Cir.), *cert. denied,*

■ While it is true that in general a search conducted without either a warrant or probable cause is improper, *see, e. g., Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), one of the well-recognized exceptions to that rule is where the defendant consents to the search. *See, e. g., Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Since the court finds that defendant voluntarily consented to the search of his suitcase, the need for a warrant was obviated.

■ The defendant argues that because he was forced out of Tullo's vehicle at gunpoint and then subjected to a pat-down search for weapons, any consent to search his suitcase was not given freely and voluntarily. He relies on *United States v. Ruiz-Estrella,* 481 F.2d 723 (2d Cir. 1973), to support his contention that "[u]nder these particular facts, the government has shown no more than acquiescence to apparent lawful authority, and the theory of consent cannot be accepted." *Id.* at 728.

Looking, as it must, to the "totality of the circumstances" surrounding the defendant's consent to the suitcase search, *Schneckloth v. Bustamonte, supra* 412 U.S. at 227, 93 S.Ct. 2041, the court believes that the facts of this case are sufficiently distinguishable from *Ruiz-Estrella* to warrant a different conclusion on the issue of the voluntariness of the defendant's consent. In *Ruiz-Estrella,* the defendant "consented" to be searched only after a uniformed agent had taken him from the boarding area of the airport into a stairwell and closed the door behind them. The Court of Appeals found that the environment in which the police questioning took place was similar to a "traditional custodial situation." *United States v. Ruiz-Estrella, supra* at 728. In the instant case, however, the defendant was not in custody when his consent was

obtained; he was in the airport parking lot, a public area that "was not inherently coercive, being a far cry from custodial 'interrogation in some remote station house.'" *Id., quoting from Schneckloth v. Bustamonte, supra* 412 U.S. at 247, 93 S.Ct. 2041. Moreover, the agents had returned their guns to their holsters when the defendant's consent was obtained,[4] Agent Huber used a conversational tone of voice when requesting the defendant's permission to search, and no promises or threats were made in obtaining the consent.

■ Under these circumstances, the court finds that the defendant's consent to the suitcase search was freely and voluntarily given. The court's analysis cannot end there, however, because it was not the search of the defendant's suitcase that led to the discovery of the cocaine in his possession. Rather, the cocaine was discovered after Agent Huber lifted the defendant's jacket from the floor of Tullo's automobile and the plastic bag containing cocaine fell out of the jacket. Huber's act of picking up the defendant's jacket went outside the scope of the limited consent to search that he had obtained. In addition, the act was not committed in furtherance of the legitimate activity of retrieving the suitcase from the back seat of Tullo's vehicle. The government concedes "that the extent of a search conducted pursuant to voluntary consent is limited by the bounds of the actual consent." (Government's Memorandum of Law at 23). It argues, however, that Agent Huber's movement of the defendant's jacket "was motivated by a benign purpose and was executed in good faith" *(Id.),*[5] that Huber did not employ Taibe's consent as a pretext for a search of the vehicle, and that the discovery of the cocaine was inadvertent, bringing it within

---

414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 53 (1973).

**4.** *United States v. Thompson,* 356 F.2d 216 (2d Cir. 1965) and *United States v. Sullivan,* 321 F.Supp. 597 (S.D.N.Y.1971), indicate that the fact that an individual is confronted by police officers with their guns drawn does not of itself vitiate the consent to search.

**5.** Huber testified that while he was in Tullo's automobile retrieving the defendant's suitcase, he picked up the jacket to give it to the defendant because it had begun to rain and the defendant was coatless.

the ambit of the "plain view" doctrine. *See Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

 The court finds that Agent Huber did not act inadvertently in picking up the defendant's jacket and therefore the seizure of the cocaine cannot be justified under the "plain view" doctrine. Huber knew that Agent Sears had seen the defendant trying to stuff his jacket under the front seat of the automobile. It is reasonable to conclude that he picked up the jacket because he was suspicious about what the defendant was attempting to hide, not because he was interested in protecting him from the elements.[6] To fall within the "plain view" exception to the warrant requirement, the discovery of evidence must be inadvertent. *Coolidge v. New Hampshire,* 403 U.S. 443, 469, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Because the court finds that the discovery of the cocaine here was not inadvertent, the "plain view" doctrine cannot justify the agents' seizure of the cocaine.

In addition to its assertion that the "plain view" doctrine applies to this case, the government also argues that the warrantless seizure of the cocaine was valid by virtue of the "inevitable discovery" doctrine. The government urges that the contents of the suitcase, which were discovered as a result of defendant's valid consent to search the suitcase gave rise to probable cause to search Tullo's vehicle. Exigent circumstances would then have justified an immediate search of the vehicle and, during the course of what would then have been a

valid search, the cocaine would inevitably have been discovered.[7]

The court agrees with the government that under these circumstances the cocaine in the defendant's possession would have been discovered even if Agent Huber had not illegally searched the defendant's jacket. The valid consent search of the suitcase led to the discovery of a bag of white powder and a narcotics identification kit. These items, coupled with the defendant's suspicious behavior at the airport and the fact that he was suspected of drug trafficking, gave rise to probable cause to believe that Tullo's vehicle contained additional contraband. Because of the potential mobility of the car and its location in a public parking lot, the agents could have conducted an immediate search of the automobile, *Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974); *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), and in all likelihood the cocaine would have inevitably been discovered.

While the "inevitable discovery" doctrine requires the court to engage in hypothetical reasoning to determine whether an independent source for the discovery of otherwise illegally obtained evidence existed, the Court of Appeals for the Second Circuit appears to have endorsed such an analysis.[8] *See United States v. Jarvis,* 560 F.2d 494 (2d Cir. 1977); *United States v. Ceccolini,* 542 F.2d 136 (2d Cir. 1976), *cert. granted,* 431 U.S. 903, 97 S.Ct. 1693, 52 L.Ed.2d 306 (1977). In *Jarvis,* the defendant was illegally arrested when the police entered his home with an invalid warrant. He sought

---

**6.** In fact, Huber never gave the defendant his jacket; he left it on the front seat of the automobile after the cocaine fell out of the pocket.

**7.** Because the court has determined that the agents conducted a valid consent search of the defendant's suitcase, it need not address the government's alternative argument under the "inevitable discovery" doctrine that probable cause to search the vehicle existed prior to the time that Agent Huber entered the vehicle, that exigent circumstances existed to justify a warrantless search of the vehicle, and that, therefore, discovery of the cocaine was inevitable.

**8.** The Fifth Circuit has rejected the "inevitable discovery" rule "because it requires speculation by the Court as to what would have happened had the illegality not occurred." *United States v. Villarreal,* 565 F.2d 932, 942 (5th Cir. 1978) (Wisdom, J., dissenting) and cases cited therein. The rule has never been endorsed by the Supreme Court. *United States v. Massey,* 437 F.Supp. 843, n. 3 at 854 (M.D.Fla.1977). *See also Fitzpatrick v. New York,* 414 U.S. 1050, 94 S.Ct. 554, 38 L.Ed.2d 338 (1973) (White, J., dissenting from denial of cert.). For the positions of the courts of appeals for other circuits *see United States v. Massey, supra,* n. 3 at 853–54.

to suppress certain evidence that was obtained subsequent to that arrest. The court found that the agents had probable cause to arrest the defendant and, had they waited outside his home, they could have arrested him when he emerged based solely on probable cause. Then they would have obtained the evidence which the defendant sought to suppress. The court concluded that the illegal arrest was not a "but for" cause for the introduction of the evidence which the defendant sought to suppress and therefore the motion to suppress was denied. *United States v. Jarvis, supra* at 498.

The fact situation in this case is sufficiently similar to that in *Jarvis* to warrant the same result on the motion to suppress. As in *Jarvis*, "no evidence is being challenged which could not have been obtained even without the illegal [search]." *Id.* at 499. The government is not attempting to exploit an unlawful search "by obtaining a conviction on the basis of the very evidence not shown to have been otherwise procurable, which it hoped to obtain by its unconstitutional act." *Id.*

Accordingly, for all of the above-mentioned reasons, the defendant's motion to suppress the evidence seized from him is denied. So ordered.