**UNITED STATES of America, Plaintiff,**

**v.**

**Eugene CALLABRASS, a/k/a Eugene Jones, Adie White and Raymond B. Cromer, Defendants.**

No. (S) 78 Cr. 282 (PNL).

United States District Court, S. D. New York.

Sept. 18, 1978.

Robert B. Fiske, Jr., U.S. Atty. by Richard F. Lawler, Asst. U.S. Atty., New York City, for plaintiff.

Joseph I. Stone, Robert J. Saltzman, Jack Lipson, New York City, for defendants.

## MEMORANDUM OPINION

LEVAL, District Judge.

The defendants move to suppress items seized from a house located at 146–39 183rd Street, Queens, New York. The motion is denied.

The facts brought out at a pre-trial hearing are as follows. On February 19, 1978 the New York City Fire Department responded to a fire alarm at 146–39 183rd Street, Queens. The firemen arrived at the scene of the fire at approximately 4 p. m. The firemen observed smoke coming out of the rear bedroom. The front entrance of the house was blocked by unshoveled snow, but the rear door, which led into the kitchen, was unlocked. The firemen entered the house through this rear door and found a fire burning in the back bedroom and the adjacent hallway. The rest of the house was filled with smoke and visibility was limited. The firefighters, immediately upon entering the home, made a "primary search" for persons trapped in the building and broke the windows to allow the smoke to escape.

After the flames in the back bedroom were extinguished, the firemen undertook a "secondary search" in accordance with usual firefighting procedures. In this procedure the firemen thoroughly search the entire premises for any person who might have hidden from the fire. Every conceivable hiding place into which the tiniest infant could fit—including closets, cabinets, drawers, refrigerators, hampers, etc.—is opened and searched. In addition, the entire premises are overhauled to extinguish any lingering combustion or hidden flames. This involves removing all the baseboards, checking in the walls, and taking other precautions to be certain that the fire is fully extinguished.

The house appeared to be uninhabited. It was sparsely furnished. There were practically no clothes in the closets and there was no food in the refrigerator. However, in the kitchen, living room and bedroom were a variety of laboratory equipment, including many beakers, burners, and chemicals. Numerous papers were strewn about on table tops and on the floor. The firemen believed the fire in the bedroom might have been caused by chemicals. Among the chemicals observed were ether, potassium cyanide and chloroform. There were many beakers containing unidentified chemicals. In addition, many items appeared to be drug paraphernalia.

The fire was initially classified as "suspicious." Because of the suspicious origins of the fire, the presence of dangerous chemicals, and the presence of drug paraphernalia, the police and fire marshals were called.

A further reason for calling the police was to secure the premises, as the windows had been knocked out and doors broken. The firemen did not know who owned the house. No one was present. Neighbors advised that the house had been vacant for about a month. Some neighbors told of having seen two men flee from the building when the fire broke out and try to enter a 1972 tan Ford Pinto which was parked in front of the house. The men had been unable to enter the car and had fled on foot. The firemen had found the keys to the Pinto on a table in the living room.

When the police arrived around 5 p. m., the firemen turned over to them the keys to the Pinto and took them through the house to show them what had been observed.

Among the police officers who reported to the scene was Detective Cassidy who had ten years experience in narcotics work. Because he observed explosive and flammable chemicals such as ether and benzine, as well as unidentified potentially dangerous chemicals, he summoned Emergency Services and the Bomb Squad.

Along with the beakers, bunsen burners, chemicals and laboratory equipment, Cassidy observed articles which appeared to be narcotics paraphernalia, including numerous containers of lactose which is commonly used as a narcotics dilutant, glassine envelopes which are commonly used in narcotics distribution and a triple beam balance scale. Among the books and papers strewn about on table tops and on the floor were chemistry textbooks, a book entitled "Cocaine Consumer's Handbook" and a pamphlet entitled "The Synthesis of Phencyclidine and Other 1-Arylcyclohexylamines". Phencyclidine is a depressant drug commonly known as PCP or Angel Dust which is illegally trafficked. Other papers in plain sight included a U.S. Patent Office publication on the making of PCP and handwritten lists containing references to many chemicals including piperidine cyclohexanone. These chemicals are referred to on the face of the phencyclidine article as chemicals used in making PCP. Cassidy knew that ether (which he had seen in the kitchen) was also used in making PCP. Cassidy also observed strainers, heaters and a container of parsley leaves. Although these items may be used for innocent purposes Cassidy knew that they are used in the manufacture of drugs as well. For example, parsley leaves are saturated with PCP for sale. On the basis of these observations Cassidy had probable cause to conclude that the house was being used as a laboratory for the illegal manufacture of PCP and that the laboratory equipment, paraphernalia, books and papers which he observed were evidence of this criminal activity.

Cassidy personally seized all the books and papers which were in plain sight (1) because of their obvious evidentiary value with respect to the drug activity; (2) because he hoped they might help identify the owner of the house; and (3) because he thought they might help identify which chemicals, if any, were dangerous and would thus require special handling. A further motive for seizing items of possible value or importance was to safeguard them, since the house was no longer secure. The windows and doors had been broken by the firefighters and there was no one to take possession of the house and its contents.

All dangerous chemicals and unidentified (potentially dangerous) chemicals were taken by the bomb squad in the special bomb trucks.

The lab equipment, glassware, utensils, other chemicals, and paraphernalia were seized at Cassidy's instructions by Patrolman Shyne of the New York City Police.

Everything that was seized was in plain sight. Most of the objects in the house were out in plain sight due to the precautions taken by the Fire Department.

Although it appears that most of the contents of the house were taken, informed selectivity was employed in the seizures. Officer Shyne's testimony on this subject was somewhat confusing. At times it seemed he was testifying that he had packed up everything. On closer examination, it was clear that he had taken what Cassidy directed him to take, these being items which Cassidy found to have eviden-

tiary value, and had left other items (although small and easily transportable) behind. The fact that the vast majority of the contents of the house appears to have been seized is not inconsistent with such informed selectivity. By all indications the house was uninhabited. There was neither food nor clothing in it; the visible evidence therefore suggested not only that the house was being used as a PCP laboratory, but also that it was being used for nothing else. These factors further supported the reasonableness of Cassidy's conclusion that potentially innocent items such as kitchen objects had evidentiary value in the drug context. For it was clear they were not being used here for innocent kitchen purposes. There was no indication of any activity in the house other than the fabrication of PCP.

The police also seized the car parked in the street. Its probable evidentiary value was clear considering the information furnished by the neighbors that two men fleeing the burning house had tried to enter it before escaping, and upon the discovery of its keys in the house. Pursuant to routine police regulations which are followed with respect to all car seizures, both those made in connection with investigation of crime as well as for administrative purposes, Shyne inventoried the contents of the car at the police station. In the trunk he found a plastic container with powder in it. He vouchered both the plastic container and the car and sent the plastic container to the lab for analysis.

Cassidy vacated the house after midnight. The seized papers gave him no indication of the owner of the house. The next day, Monday, he went to the city register but found it closed. He returned to the neighborhood and recanvassed neighbors in an effort to learn the owner's name. On Tuesday he returned to the city register, and found that the·owner was one Mercurio, whom he promptly located.

Mercurio was unaware of the fire. He told Cassidy he was in the process of re-renting the house, the prior tenants having left a month before. He was negotiating an as yet unsigned lease with a Eugene Jones from whom he had received a deposit. The lease was not to take effect until March 1, but in the meantime he had given Jones permission to enter the premises in order to paint. Mercurio stated that he had been in the house three days prior to the fire. At that time the house had been cleaned up and there were no chemicals in it. Mercurio gave Cassidy a copy of the unsigned draft lease in favor of Jones and gave Cassidy permission to reenter and search.

Wednesday Cassidy returned to the house and seized a shirt hanging in the closet in the rear bedroom. Outside on the street, approximately underneath the spot where the Pinto had been parked, Cassidy found a blue coat frozen in the snow. Cassidy seized the coat and found a note inside a pocket. The defendants do not contest the lawfulness of the seizure of the blue lab coat and the note.

■ I find that all the seizures were lawful and reasonable and violated no rights of the defendants.

■ The right of the firemen to enter a burning building without a warrant to fight the fire is clear. The recent Supreme Court case of *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) makes clear in addition the appropriateness of warrantless police entry when summoned by the firemen to assist in exigent circumstances and to investigate the suspicious origins of the fire. In this case there were a variety of additional exigent circumstances validating warrantless police entry, including the need to determine the identity of the owner to advise him of the fire, the need to secure the house and protect its contents following the firemen's breaking of the doors and windows, the need to secure dangerous and combustible chemicals and poisons, and the need to preserve from removal or destruction evidence of crimes involving narcotics and possibly arson.

Having the right to be on the premises and, as set forth above, probable cause to believe that criminal activity was being conducted there, the police had the right to

seize objects of apparent evidentiary value which were in plain sight. *See United States v. Berenguer*, 562 F.2d 206, 210 (2d Cir. 1977); *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

■ As previously noted, everything that was seized was in plain sight. The items seized furthermore had apparent evidentiary value. To understand the apparent evidentiary value, it is necessary to consider these items in the context in which the police found them. The defendants argue that a chemistry textbook, a closed notebook or a glass beaker or kitchen utensil do not possess any apparent evidentiary value showing the commission of a crime. While that may be true of the items if considered in isolation, it was not true in the circumstances in which the police found them.

As I have indicated above, the presence of certain items including the "Cocaine Consumer's Handbook," printed material describing the manufacture of PCP, chemicals used in the manufacture of PCP, laboratory equipment, scales, strainers, large quantities of glassine envelopes and lactose, as well as the neighbors' report that two men had fled when the fire broke out, gave very strong indications that the house was being used as a laboratory for the manufacture of illegal drugs. The absence of other kinds of items, such as food in the refrigerator, clothes in the closets, bedclothing on the beds, normal furniture throughout the house, gave very strong indications that the house was not occupied or used for any other purpose. In this context there was good and apparent reason to believe that the chemistry textbooks, notebooks, kitchen utensils and parsley flakes related to, and were evidence of, the illegal drug activity.

■ There was further justification for the seizure and examination of many of the items. Certain chemicals were explosive, poisonous or otherwise dangerous. It was appropriate for the police to remove these from the house.

A part of the reason for which the notebooks, books and papers were taken and examined was the hope that some paper might identify the owner of the house, thereby enabling Cassidy to notify him of the fire. Although the defendants argue that Cassidy's testimony as to this purpose is not worthy of belief, I find to the contrary. Cassidy's actions were altogether consistent with this testimony. He went to great lengths to identify and locate the owner, making one trip to the city register on Monday to find it closed, making a second trip on Tuesday during which he succeeded in acquiring the information, and from there in fact proceeding to contact the owner.

■ Cassidy's return on February 22 when he seized the white shirt was with the permission of the owner and was therefore lawful. The owner's right to give the police permission to enter was not diminished by the fact that he was in the process of negotiating a lease and had permitted the prospective tenant to enter the empty house to paint. The landlord had not yielded to the tenant his own right to enter or invite whomever he pleased.[1] *Cf., United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *United States v. Ellis*, 461 F.2d 962 (2d Cir.), *cert. denied*, 409 U.S. 866, 93 S.Ct. 162, 34 L.Ed.2d 115 (1972); *United States v. Cook*, 530 F.2d 145 (7th Cir. 1976), *cert. denied*, 426 U.S. 909, 96 S.Ct. 2234, 48 L.Ed.2d 835 (1976).

Finally I find that the seizure and subsequent search of the Pinto were lawful.

■ The police had probable cause to believe that a criminal enterprise had been conducted in the house by two men whom neighbors had observed fleeing the burning house and trying to enter the car parked in front. The relationship of the car to the persons engaged in drug fabrication in the house was confirmed by the discovery of the car keys in the house. Thus the car had apparent evidentiary value in connection

1. Indeed I can see no reason why the owner's permission, happily given to the police on February 21 to enter and take anything they want- ed should not be retroactively applicable to the seizures which they made while lawfully on the premises two days earlier.

with the illegal narcotic activity being conducted in the house. It is clear that there was probable cause which would have supported a warrant for its seizure.

The inherent mobility of cars constitutes exigent circumstances which justify dispensing with the warrant requirement. *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). *Cf., United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) in which the Court upheld the warrantless seizure (but not the subsequent warrantless search) of a footlocker because of similar considerations having to do with the likelihood of the disappearance of the evidence.

The propriety of the subsequent station-house search of the car during which the police found a plastic bag of white powder in the trunk requires some further analysis. It raises the narrow issue whether the Supreme Court's ruling in *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), which authorized warrantless routine inventory searches of impounded vehicles, is also applicable to vehicles seized pursuant to a criminal investigation.

In *Opperman,* the respondent's car had been impounded for parking violations. The police, following standard procedures applicable to all impounded cars, inventoried the contents of the car, and discovered marijuana in the glove compartment. Respondent's conviction for possession of marijuana was upheld. The Court stated, 428 U.S. at 369, 96 S.Ct. at 3097:

> When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents. These procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody, *United States v. Mitchell,* 458 F.2d 960, 961 (CA9 1972); the protection of the police against claims or disputes over lost or stolen property, *United States v. Kelehar,* 470 F.2d 176, 178 (CA5 1972); and

the protection of the police from potential danger, *Cooper v. California, supra* 386 U.S. [58 (1967)], at 61–62, 87 S.Ct. [788] at 790 [17 L.Ed.2d 730.]

The Court found that the police in that case were "indisputably engaged in a caretaking search of a lawfully impounded automobile," 428 U.S. at 375, 96 S.Ct. at 3100, and that their conduct was not therefore "unreasonable" under the Fourth Amendment. 428 U.S. at 376, 96 S.Ct. 3092.

The record here established that the search of the Pinto was conducted, as in *Opperman,* pursuant to routine police department regulations requiring the inventory of the contents of all impounded vehicles. Patrolman Shyne's testimony to this effect was not challenged.

*Opperman* implicitly suggested that a different result might be warranted where the police seized a car under a "pretext concealing an investigatory police motive," 428 U.S. at 376, 96 S.Ct. at 3100. It would be difficult to sustain the "reasonableness" of a search where the police contrived a ploy to seize a parked car so as to be able to search it free of the warrant requirement. *See, e. g. Amador-Gonzalez v. United States,* 391 F.2d 308, 313–15 (5th Cir. 1968).

But this case contains no suggestion of bad faith, deception or unreasonableness. The police had a proper justification for seizing the car. Having done so, they followed reasonable standard procedures to inventory its contents for the protection of the owner and the police. The reasonableness of those uniform procedures is controlling, regardless of the fact that the car was seized for investigative, rather than administrative, reasons.

Furthermore, as noted above, the special characteristics of an automobile have repeatedly been held to make reasonable warrantless searches in a criminal search context. *See Texas v. White,* 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209; *Chambers v. Maroney, supra ; Carroll v. United States, supra. Chambers v. Maroney, supra,* rested on the further proposition that the right to seize a car encompassed the right thereafter to search it.

It may be argued that the theory of the Supreme Court's more recent decision in *United States v. Chadwick, supra,* casts doubt on all these prior cases, and that a warrant is now needed to search a car even after a lawful warrantless seizure. But the decision in *Chadwick* explicitly disavowed application to automobiles, alluding to their special qualities which have always required different rules, and in particular to "the diminished expectation of privacy which surrounds the automobile." 97 S.Ct. at 2484. *See also Almeida-Sanchez v. United States,* 413 U.S. 266, 279, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) (Powell, J., concurring). Furthermore, where the search is conducted pursuant to standard inventorying regulations, applicable to all impounded cars regardless of the reason for the impounding, and is limited in scope to such an inventory (i. e., not a thorough criminal search which might involve substantially dismantling the car), all the considerations which were found to make the *Opperman* search reasonable are applicable, despite the investigative purpose of the seizure.

I conclude that a warrantless routine inventory search conducted in good faith pursuant to department regulations for all impounded vehicles is lawful under the *Opperman* holding even though the vehicle was seized in the course of a criminal investigation.

A final question arises from the fact that the *Opperman* search did not extend to the trunk of the car, which is where Shyne found the white powder in the Pinto. The marijuana in *Opperman* was found in the unlocked glove compartment within the locked car. There was no testimony as to whether the Pinto's trunk was locked, but in any event Shyne was in possession of the car keys.

Although the dissent in *Opperman* raises the possibility that its holding may not cover trunks, 428 U.S. at 385 n.1, 96 S.Ct. 3092,[2] I can discern no meaningful difference.

I doubt that there is any greater expectation of privacy one way or another as be-

tween a locked trunk and an unlocked glove compartment in a locked car. And the proper purposes of the inventory search are equally applicable throughout the car. *See United States v. Edwards,* 577 F.2d 883, 894 (5th Cir. en banc, 1978). It is arguable that some difference may arise if it were necessary to damage the vehicle in order to open the trunk, but that factor was not present here.

The motion to suppress is accordingly denied.

SO ORDERED.

2. *See also* footnote 10 to the majority opinion, 428 U.S. at 376, 96 S.Ct. 3092.