UNITED STATES of America,

v.

Gilberto ALVARADO–BERMUDEZ,
Defendant.

No. 80 CR 396.

United States District Court,
E. D. New York.

Oct. 21, 1980.

E. R. Korman, U. S. Atty. E.D.N.Y., by Thomas Roche, Asst. U. S. Atty., Brooklyn, N. Y., for plaintiff.

Donald M. Zolin, New York City, for defendant.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Defendant has been indicted for knowingly and intentionally possessing with intent to distribute approximately 507 grams of cocaine and for falsely and wilfully representing himself to be a citizen of the United States, both offenses allegedly occurring on July 27, 1980 at JFK International Airport, Queens, New York. He has moved to suppress the evidence seized and statements taken from him by members of the Immigration and Naturalization Service ("INS") on that occasion.

### I

On Sunday morning, July 27, 1980, Thomas Flood, Maurice Bressler and Richard Nocella, three INS Criminal Investigators, were observing passengers deplaning from American Airlines Flight No. 10 upon its arrival at the airport from Los Angeles. The purpose of such surveillance was to apprehend illegal aliens from Mexico and South America.

Before spotting the defendant, the investigators stopped and detained a number of persons suspected of being illegal aliens. Mr. Flood then observed a well dressed, Hispanic man who, after seeing Inspector Bressler questioning the suspected group, veered off to the left and away from the general flow of the deplaning passengers. This individual then attempted to avoid a confrontation by walking away at an increased pace. After observing this conduct, Investigator Flood "called to Investigator Bressler, Investigator Bressler waved his hand to me indicating to me that he had seen ... something also" and the defendant was stopped.

Thereafter, Investigator Flood asked the defendant where he was born, to which he replied "Puerto Rico." Mr. Flood then inquired about defendant's citizenship, and he replied that he was a citizen of the United States and showed Investigator Flood a Puerto Rican birth certificate. However, Investigator Flood noticed that there was no validating signature on the bottom line and corner. Defendant was then asked a number of questions concerning the Puerto Rican variants for "nickel" and "dime". Investigator Flood's suspicions were aroused when defendant did not reply "Vellon" for nickel and "La Ficha" for dime. These suspicions were heightened when defendant was asked what his mother's maiden name was and he couldn't remember.

Believing, at that point, the defendant to be an alien illegally in the United States, Investigator Flood placed him under administrative arrest under and pursuant to 8 U.S.C. § 1357(a)(2).[1]

Having placed the defendant under administrative arrest, Investigator Flood searched his person and found a baggage claim ticket in his wallet which was given to Investigator Bressler who obtained defendant's bag and gave it to Investigator Flood. Mr. Flood then went over to the

---

1. **§ 1357. Powers of immigration officers and employees–Powers without warrant**

   (a) Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant ·
   
   (1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;
   
   (2) to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regu-
   lation made in pursuance of law regulating the admission, exclusion, or expulsion of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest,·but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States.

defendant and asked him whether he had his permission to open the bag. Defendant answered in the affirmative and Investigator Flood opened the bag and found several articles of clothing and a brown briefcase with a double combination lock. He brought the latter to the defendant and "asked him was he willing to open up the briefcase. He told me yes. He [defendant'] then proceeded to work the two combination locks and opened the briefcase." (Tr. 21).

Investigator Flood took the now open briefcase from the defendant and found a brown paper bag wrapped with some rubber bands which contained a white plastic bag with a white powdery substance. At that point Investigator Nocella took the paper bag, showed it to the defendant and asked him what it was, to which the defendant replied "cocaine". (Tr. 22).

Investigator Flood then advised the defendant that he was under arrest for possession of drugs and Investigator Nocella gave him his *Miranda* warnings. After that defendant was transported to the Immigration Office where he was again given his *Miranda* warnings.

In support of the motion to suppress, defendant claims that (i) the "stop and subsequent arrest of the defendant were impermissible"; (ii) "the search of the defendant's wallet was improper"; (iii) "the seizure of the suitcase by Federal employees violated defendant's Fourth Amendment rights and was an impermissible search of the baggage"; and (iv) "the Government did not meet its burden of showing that the defendant voluntarily and knowingly consented to a search of the baggage or the briefcase at the airport."

## II

As indicated in footnote 1, *supra* § 1357(a)(1) of Title 8 of the United States Code authorizes any INS officer "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States."

■ In the case at bar, Investigator Flood, who has been employed as a criminal investigator for the INS for seven years and has made approximately 2500 arrests of illegal aliens (a thousand of which have been made at airports under domestic flight stops), testified that he stopped the defendant because (i) he looked Hispanic; (ii) he was wearing a suit; (iii) he reacted "to the presence of Investigator Bressler who was in the process of standing there with his badge up in the air identifying himself to other people that he had stopped"; and (iv) he broke "the line of people coming off and veer[ed] to the left." (Tr. 33–34). Under very similar circumstances, we held in *United States v. Hernandez–Rojas*, 470 F.Supp. 1212, *affirmed without opinion*, 615 F.2d 1351 (2d Cir. 1980), that such facts could give rise to a reasonable suspicion to justify the encounter. We reiterate our conclusion from that case in upholding the stop in the instant case:

> In sum, therefore, judging Agent Flood's conduct in light of the totality of the circumstances before him, this Court finds that he was able to point to specific and articulable facts on the basis of which he formed a reasonable suspicion that defendant was an illegal alien and that Agent Flood's questions to and initial stop of the defendant were reasonably related in scope to this suspicion and to the authority vested in him under Section 287(a)(1) of the Immigration and Nationality Act, *supra*.

470 F.Supp. at 1220.

■ Furthermore, when the defendant produced a birth certificate without a signature and was unable to give appropriate responses in phrases commonly used by Puerto Ricans and did not know his mother's maiden name, "Agent Flood had probable cause to arrest him pursuant to Section * * * 287(a)(2) of the Immigration and Nationality Act, 8 U.S.C. §§ * * * 1357(a)(2). *United States v. Rico*, 594 F.2d 320 at 326–27 (2d Cir. 1979)." *Id.* at 1220–1221.

■ Having established the legality of the stop and the arrest, we also hold that

Investigator Flood's "pat down" or frisk of defendant's person "was perfectly proper as a search incident to a lawful arrest" and the seizure of the baggage claim ticket discovered during the search was also perfectly proper.[2] *Id.* at 1221 and cases cited therein.

### III

The question then arises whether the defendant's consent to a search of his bag and the briefcase contained therein was knowledgeable and voluntary. We hold that under the totality of the circumstances presented herein that it was.

Although, as defendant argues, he was never advised of his right to refuse to give the investigators permission to look in his bag and briefcase, the Supreme Court has held such failure not to be determinative of the question of whether a consent was freely and voluntarily given. *Schneckloth v. Bustamonte,* 412 U.S. 218, 231–233, 93 S.Ct. 2041, 2049, 36 L.Ed.2d 854 (1973); *United States v. Valencia,* Docket Nos. 79–1365–66, Slip Op. 5651 (2d Cir. September 18, 1980).

■ Defendant here was under an administrative (civil) arrest by INS agents in civilian clothes. He was in a public place—an American Airlines Terminal—no force, threats, compulsion or coercion were expressed or indicated. He was not under the influence of drugs nor was there any evidence offered of lack of mental capacity or of any deception practised. He was asked for his permission to search each bag and he gave it. He did not take the stand and deny or dispute any of the foregoing and did not testify that his consent was other than a knowing, free and voluntary act, nor did he call any witnesses or present any evidence to indicate the same. This Court is aware of the fact that it is the government, and not the defendant, which has the burden of proving the voluntary nature of the consent; the government has met its burden in this case by producing the uncontradicted testimony of the investigator who performed the search. Under the circumstances, the search must be held to have been pursuant to his voluntary consent and to be lawful.

### IV

■ Moreover, even if we were to find that the defendant's consent was not voluntarily given, we find that at most this particular search was, or was tantamount to, an inventory search which would have inevitably taken place a short time later when defendant was transported to the Immigration detention facilities. *South Dakota v. Opperman,* 428 U.S. 364, 370, 96 S.Ct. 3092, 3097, 49 L.Ed.2d 1000 (1976); *United States v. Friesen,* 545 F.2d 672 (9th Cir.), *cert. denied,* 433 U.S. 911, 97 S.Ct. 2980, 53 L.Ed.2d 1096 (1977); *United States v. Gravitt,* 484 F.2d 375, 378 (5th Cir. 1973); *United States v. Callabrass,* 469 F.Supp. 323 (S.D.N.Y.1978); *United States v. Castro–Tirado,* 407 F.Supp. 210 (E.D.N.Y.1976) (inventory searches upheld). *United States v. Marchand,* 564 F.2d 983, 992, n. 19 (2d Cir. 1977), *pet. for rehearing en banc denied,* 564 F.2d 1001, *cert. denied,* 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978); *United States v. Jarvis,* 560 F.2d 494, 498 (2d Cir. 1977), *cert. denied,* 435 U.S. 934, 98 S.Ct. 1511, 55 L.Ed.2d 582 (1978); *United States v. Galante,* 547 F.2d 733, 742 (2d Cir. 1976) (Kaufman, C. J., concurring), *cert. denied,* 431 U.S. 969, 97 S.Ct. 2930, 53 L.Ed.2d 1066 (1977); *United States v. Ceccolini,* 542 F.2d 136, 140 (2d Cir. 1976), *rev'd on other grounds,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); *United States v. Falley,* 489 F.2d 33, 40–41 (2d Cir. 1973); *United States v. Taibe,* 446 F.Supp. 1142 (E.D.N.Y.

---

2. Defendant argues nonetheless that the search of his wallet was improper. The Court of Appeals for this Circuit answered this contention recently in *United States v. Valencia,* Docket Nos. 79–1365–66, Slip Op. 5651 (2d Cir. September 18, 1980), as follows:

the search of Olga's pocketbook containing the narcotics related writing can also be justified as incidental to a lawful arrest, irrespective of Olga's consent to search. The pocketbook was on the table within reach of both William and Olga, and an arresting officer is entitled to search belongings in "the area into which an arrestee might reach in order to grab a weapon or evidentiary items." *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969).

Slip op. at 5665.

1978), *affirmed without opinion,* 591 F.2d 1333 (2d Cir. 1979) (inevitable discoveries).

Under INS Regulations,[3] the contents of all detainees' luggage are inventoried on their arrival at detention facilities so that they will be protected against claims for missing valuables, etc., and at the same time detainees are given access to their luggage for changes of clothing, toilet articles and other personal effects while they are held pending their deportation and hearings in connection therewith. Absent evidence, and there was none produced here, that the search was for the purpose of uncovering evidence for criminal prosecution, a "premature" inventory (as the search here might be described) to enable the investigators to transport the defendant with his luggage and several other detainees to the detention facilities without fear of trouble from relatives or others at the airport must be deemed to be perfectly proper and lawful.

For the foregoing reasons defendant's motion to suppress must be, and the same is hereby denied in all respects.

SO ORDERED.

---

3. *See* Immigration and Naturalization Administrative Manual § 2798.69.20 (January 7, 1970, revised December 9, 1977). Subsection 20 prescribes the procedures for protecting and caring for baggage and personal property of detainees.