**UNITED STATES of America, Plaintiff,**

v.

**Luis LOPEZ–BARAJAS, Defendant.**

**No. 75 CR 924.**

United States District Court, E. D. New York.

May 6, 1976.

David G. Trager, U. S. Atty., Brooklyn, N. Y., for plaintiff; Carol B. Amon, Asst. U. S. Atty., Brooklyn, N. Y., of counsel.

Alvin S. Michaelson, Beverly Hills, Cal., Markewich, Rosenhaus, Markewich & Friedman, P. C., New York City, for defendant.

## OPINION AND ORDER

PLATT, District Judge.

Defendant was indicted on December 5, 1975, for knowingly and intentionally possessing with intent to distribute almost a kilogram (927 grams) of heroin on November 16, 1975 in violation of Title 21 U.S.C. § 841(a)(1).

By notice of motion with an affidavit of his attorney and a memorandum of law annexed, defendant moved to suppress "as evidence in any criminal proceeding the fruits of his unlawful detention by agents of the United States Government on November 16, 1975, including but not limited to all physical evidence seized from his person and any oral or written statement made by the defendant at or subsequent to his unlawful detention." A hearing was held on this motion on February 13, 1976 during the course of which testimony was taken from Thomas Flood, a criminal investigator of the Immigration and Naturalization Service.

## FACTS

The following facts were stipulated and agreed to for the purposes of the hearing and the motion:

"[O]n the morning of November 16, 1975 the defendant LUIS LOPEZ–BARAJAS was stopped and detained by agents of the United States Immigration and Naturalization Service moments after he disembarked at Gate No. 9 after a flight from Los Angeles to New York's Kennedy Airport on Trans-World Airlines Flight No. 702. Gate No. 9 is located in Flight Wing No. 2 of the Trans-World Airlines Terminal which is the flight wing used for domestic arrivals.

"All passengers arriving on TWA International flights disembark in Flight Wing No. 1 where the United States Customs Service maintains its airport operations. There is a large arrival-departure board and numerous smaller monitors in both wings of the terminal which give TWA flight information and which would in the normal course of business have indicated that the Los Angeles to New York flight would be landing at Gate No. 9 on November 16, 1975."

Mr. Flood testified that he had been a criminal investigator for the INS since November of 1973; that during his tour of duty he had apprehended and arrested over a thousand illegal aliens; that he spoke Spanish; that since March of 1974 he had been assigned to investigate, on a five day a week basis, four domestic flights from Los Angeles to New York, to wit: TWA Flight Nos. 702 and 16, and American Airline Flight Nos. 38 and 10; that all such flights left Los Angeles at or about 10:00 PM and arrived in New York at or about 6:00 AM; that during the period from March 1975 to November 16, 1975 over 400 illegal aliens disembarking from such flights had been arrested, 95% of the aliens being of Hispanic origin; and that during the period October 1, 1975 to November 16, 1975 approximately 135 illegal aliens had been arrested from such flights, 75 of whom had been arrested by him.

On cross-examination, Mr. Flood testified that during the period from March 1975 to the date of the hearing there had been approximately 1800 "stops" of disembarking passengers; that 95% of such stops involved aliens; that two-thirds of such stops involved legal aliens and one-third or approximately 600 of such stops involved illegal aliens.

These four flights had been selected by the INS for observation because experience had shown that illegal aliens with contraband chose off-business hour flights such as these on which to travel, presumably with the thought that there would be less chance of their being observed.

Mr. Flood testified that on Sunday morning, November 16, 1975, at 7:00 o'clock, he was on duty at Gate No. 9 of TWA's terminal when approximately 60 passengers disembarked from Flight No. 702, a non-stop flight from Los Angeles. Working with him observing the passengers were INS Agents Levenisky and Pangia. The three of them were stationed approximately 10 feet apart along an area which each passenger had to traverse to reach the main portion of the terminal building.

Mr. Flood saw the defendant coming out of the Gate 9 area. His attention was attracted to him because (i) he was Hispanic, (ii) he wore shoes with two to three inch heels, (iii) he had on dark green pants with a blue and red check shirt, and (iv) he was carrying a light blue suit without a plastic or other covering bag on a hanger over his shoulder.

Mr. Flood stated further that he made "eye contact" with the defendant; the defendant stopped; they stared at each other for about 15 seconds; the defendant gave the appearance of looking for a way out; the defendant turned around and took a step towards the plane; he was confronted by the remaining disembarking passengers; and he then turned around and again stared at Mr. Flood.

Mr. Flood then stepped forward and asked the defendant if he spoke English. The defendant replied in the negative. Mr. Flood then identified himself as an Agent of the INS, and Mr. Levenisky came up and began to talk to the defendant while Mr. Flood commenced talking to yet another alien from El Salvador who admitted that he had no permission to be in the United States.

When Mr. Flood returned his attention to the defendant, Mr. Levenisky advised that the defendant claimed to be a citizen and had shown him a social security card, a California driver's license and a selective service card. Mr. Flood then asked the defendant where he was born, to which the defendant replied "San Diego". Mr. Flood asked him who was the President of the United States, to which the defendant replied that he did not remember. Mr. Flood next asked the defendant how many states there were in the United States, to which the defendant answered hesitatingly fifty-six (56).

Mr. Flood informed the defendant that there were only 50 states in the Union and asked him what country he was from, at which point defendant acknowledged that he was from Mexico and that he had no permission to be in the United States.

Following such admission, Agent Levenisky searched the defendant and found the heroin under a girdle wrapped around his waist, whereupon the defendant was arrested and given his *Miranda* warnings which he acknowledged he understood.

Defendant was then asked what the substance, which later proved to be heroin, was and he acknowledged that it was drugs, and when asked further what kind of drugs, he said "heroin".

Later questioning revealed that the defendant had illegally entered the United States, stayed in Los Angeles for a short period of time, returned to Mexico to obtain the drugs and had re-entered on November 2, 1975, without any documents giving him permission to do so.

## DISCUSSION

Defendant's motion to suppress physical evidence and admissions is based solely on his contention that Mr. Flood did not have "reasonable suspicion" to believe that defendant was an illegal alien when defendant was stopped and the first question was asked, and that the subsequent questioning and search were therefore illegal. Agent Flood claims that he did have a "reasonable suspicion" that the defendant was an illegal alien and that this was why he approached

him and asked him if he spoke English and the ensuing questions set forth above. Such reasonable suspicion arose, according to Agent Flood, because he himself was not in uniform but in ordinary clothes,[1] because the defendant (i) was Hispanic, (ii) was wearing high-heeled shoes, (iii) was wearing clothes not unlike clothes worn by many other illegal aliens whom he had arrested, (iv) was carrying the light blue suit on a hanger over his shoulder without any sort of covering bag, (v) acted in a suspicious and furtive way when the defendant first saw him, (vi) looked for some place to go other than past him, and (vii) attempted to return to the plane and then reversed his direction and stopped and stared at him. Based on all these factors and his experience in observing legal and illegal passengers disembarking from airplanes, and particularly from *that very flight at that same place,* Agent Flood says that he had a "reasonable suspicion" that the defendant was an illegal alien. See *United States v. Brignoni-Ponce,* 422 U.S. 873, 884–85, 95 S.Ct. 2574, 2582–83, 45 L.Ed.2d 607, 618–19 (1975).

The defendant says that the foregoing is not enough to justify a stop and questioning regarding citizenship under the principles enunciated in *United States v. Brignoni-Ponce, supra; United States v. Torres-Urena,* 513 F.2d 540 (9th Cir. 1975); *United States v. Ogilvie,* 527 F.2d 330 (9th Cir. 1975), and similar cases discussing this question. Both parties appear to agree, however, that the proper test is set forth in the *Brignoni-Ponce* case in the following terms:

". . . Except at the border and its functional equivalents, officers on roving patrol may stop [persons] only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the [persons are] aliens who may be illegally in the country." 422 U.S. at p. 884, 95 S.Ct. at 2582, 45 L.Ed.2d at 618.

The question for this Court therefore would appear to be whether the above-stated specific articulated facts "together with rational inferences" therefrom "reasonably warrant suspicion" that the defendant was an illegal alien.

The behavior of the defendant, even considered alone, was undeniably suspicious and this factor, together with the others specified above, is sufficient to distinguish this case from cases relied upon by defendant. Those cases, which are primarily opinions of the Ninth Circuit Court of Appeals, do, however, deserve individual treatment.

In *United States v. Ogilvie,* 527 F.2d 330 (9th Cir. 1975), cited by defendant as "a case most similar to our own," defendant in an automobile approached a Border Patrol Checkpoint near Nogales, Arizona, at which all northbound drivers on Interstate 19 were being stopped. Defendant exited from I–19 just before the checkpoint, crossed above the highway on an overpass, and re-entered the highway travelling south. The Court of Appeals held that her actions were not such as could create a reasonable suspicion that she was an illegal alien.[2]

The Court emphasized, however, that nothing which the defendant did was done in a suspicious, "unusual," or "erratic" manner. Further, the Border Patrol agents did not rely on her appearance as a ground for stopping her (and indeed she was charged after being stopped with possession of marijuana, not with being an illegal alien). In the case at bar, of course, defendant did turn back from Agent Flood in a suspicious

---

1. The untutored mind might well ask of what significance is the fact that Agent Flood was wearing "ordinary clothes" given the facts set forth herein. That question was answered, however, by one of the greatest many generations ago:

"Suspicion always haunts the guilty mind; The thief doth fear each bush an officer"

Wm. Shakespeare, King Henry VI Part III Act 5 Sc 6 Line 11

2. Judge Moore of this Circuit's Court of Appeals, sitting by designation, dissented on the ground that defendant's exit just before the checkpoint was by itself "suspicious enough to justify a stop for questioning," 527 F.2d at p. 332.

manner, and his appearance was consistent with his alienage.

*United States v. Carrizoza-Gaxiola,* 523 F.2d 239 (9th Cir. 1975), involved the interception of automobiles meeting a specified profile on the same I–19 by officers intent on stopping the transportation of stolen cars to Mexico. The Court held that there were no grounds for reasonable suspicion that the particular car which was stopped was stolen—and defendant's Mexican appearance and license plates did not add the necessary grounds. But in our case, of course, defendant did engage in behavior which distinguished him from other airline passengers.

In *United States v. Torres-Urena,* 513 F.2d 540 (9th Cir. 1975), the only supposedly suspicious activity of the defendant was his loading boxes into a pickup truck shortly after sunrise near a private residence that was one-fourth of a mile from the Mexican border. In *United States v. Martinez-Tapia,* 499 F.2d 1244 (9th Cir. 1974), *vacated,* 519 F.2d 1375 (9th Cir. 1975), a car was stopped because it was seen accelerating on an east-west California highway while some one and one-quarter miles from Mexico, and just past a dirt road leading south that was "often" used by smugglers. In *United States v. Mallides,* 473 F.2d 859 (9th Cir. 1973), a car was stopped because its six "Mexican-appearing" passengers did not turn to look at a passing patrol car. The activities of the defendants in these three cases—loading a truck, shifting gears on a highway, and failing to look at a police car—could hardly be considered indicative of wrong-doing. None of these defendants made suspicious attempts to avoid the authorities.

Finally, *United States v. Brignoni-Ponce, supra,* is itself instructive. The United States had relied only upon defendant's apparent Mexican ancestry as justification for stopping his car. Said the Court,

"The likelihood that any given person of Mexican ancestry is an alien is high enough to make appearance a relevant factor, but standing alone it does not justify stopping all Mexican-Americans to ask if they are aliens." 422 U.S. at pp. 886–87, 95 S.Ct. at 2583, 45 L.Ed.2d at 619.

Of course, in the case before us Agent Flood considered defendant's appearance, but only as "a relevant factor"; by no means did he rely solely on defendant's appearance.

In short, none of the cases upon which defendant relies deals with a situation with as many facts pointing toward a violation of the law as were present in this case. Defendant's appearance, his actions, and the context in which his actions took place were in this case sufficient to create a reasonable suspicion that he was an illegal alien.

Defendant at the hearing attempted to argue that his actions in looking for a way past the INS agent and in attempting to return to the plane might equally be construed to be those of an innocent man looking for someone who was meeting him at the airport and of an innocent man who had forgotten a piece of luggage or clothing on the plane. However, the forgetful man in this case turned back again and stared at the agent looking for a way past him instead of returning to the plane. Under the circumstances, Agent Flood was certainly entitled to draw a rational inference that there might be something which the defendant was attempting to conceal, and all of the factors certainly gave rise to a reasonable suspicion that the defendant was an alien who might be illegally in the country. Further, that alternative conclusions might possibly have been drawn by another is beside the point; Agent Flood *did* make a perfectly reasonable inference, and was under the law entitled to act upon it. An officer is not required to negate all possible lawful explanations of suspicious behavior before acting.

We note that recent conclusions by the Second Circuit Court of Appeals after consideration of the issues that control here support this Court's determination that the reasonable suspicion standard had been sat-

**1012**

isfied before Mr. Flood questioned defendant. In *United States v. Rodriguez,* 532 F.2d 834 (2d Cir. 1976), the Court upheld under *Brignoni-Ponce* the validity of the questioning by an INS agent of an alien. The INS agent had been told by two informants that a particular house was being used to harbor illegal aliens. He went to the house, saw "a male of 'Hispanic' appearance seated in an 'old' car" in front of the house, and without more questioned the alien, at 836. The Court decided that the information about the house "was surely enough, along with the agent's expertise," to justify questioning the alien, at 838. It seems to this Court that there was far more cause for the highly experienced Mr. Flood to be suspicious of the defendant than for the agent in *Rodriguez* to be suspicious of the man in the parked car.

We note as well the recent opinion by Judge Bartels of this Court in *United States v. Castro-Tirado,* 407 F.Supp. 210 (E.D.N.Y.1976), which involved facts almost identical to those now before us. Judge Bartels apparently did not consider the objections to the questioning of the defendant in that case to be substantial, and the defendant conceded that they were not.

Accordingly, the defendant's motion must be and the same hereby is denied.

SO ORDERED.