UNITED STATES

v.

Gustavo HERNANDEZ–ROJAS,
Defendant.

No. 78 CR 730.

United States District Court,
E. D. New York.

May 23, 1979.

fendant's status as an illegal alien, as a weapon search, as a consent search, or as an inventory search.

■ Since the reasonableness of an investigative stop and of a warrantless arrest, search and seizure must be evaluated in light of all the attendant circumstances, *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Magda,* 547 F.2d 756 (2d Cir. 1976), *cert. denied,* 434 U.S. 878, 98 S.Ct. 230, 54 L.Ed.2d 157 (1977); *United States v. Hall,* 174 U.S.App.D.C. 13, 525 F.2d 857 (1976), the facts adduced at the hearing held January 12, 1979 on defendant's motion to suppress are set forth below in some detail.

Edward R. Korman, U.S. Atty., E.D.N.Y. by Vivian Shevitz, Asst. U.S. Atty., Brooklyn, N.Y., for plaintiff.

Martin Light, Brooklyn, N.Y., for defendant.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Defendant, Felix Gustavo Hernandez-Rojas, has been indicted for possession with intent to distribute one half (½) kilogram of cocaine, a Schedule II controlled substance, in violation of Section 841(a)(1) of Title 21, United States Code. Defendant has moved to suppress evidence seized from him upon his arrest at John F. Kennedy Airport on December 4, 1978, on the grounds that his arrest and the subsequent frisk and inspection of his suitcase which revealed the cocaine and several bundles of money were unlawful and violative of his Fourth Amendment rights. In opposing defendant's motion, the Government contends that his initial detention and subsequent arrest by an investigative officer of the Immigration and Naturalization Service ("INS") were supported by reasonable suspicion and probable cause, that the search of his person was incidental to a lawful arrest, and that the search of his suitcase was either permissible as a search for evidence of de-

I

## FACTS

The only witness called at the hearing was Thomas Flood, a criminal investigator for the INS. He testified that he had been a criminal investigator for the INS for a little over five years; that since November 1974 he has been assigned to the surveillance of domestic flights arriving from Los Angeles at New York City for the purpose of apprehending illegal aliens; that since 1974 the INS has apprehended over one thousand illegal aliens deplaning domestic flights from Los Angeles; that the surveillance program has focused on four particular flights, two on Trans World Airlines and two on American Airlines, which leave Los Angeles at ten o'clock at night and arrive in New York City between five and six o'clock in the morning and which illegal aliens, especially Hispanic aliens from Central and South America, commonly use "because they feel that there is less chance of them being detected in traveling at these off hours;" and that, whereas one out of every three persons stopped at the inception of the domestic flight surveillance program were illegal aliens, now two out of every

three persons stopped are illegal aliens (Tr. 3–5).[1]

At about five o'clock in the morning of December 4, 1978, Investigators Thomas Flood and Maurice Bressler stationed themselves outside Gate No. 11 of the American Airlines terminal in the corridor linking it to the terminal lobby and baggage claim area. At approximately six o'clock, American Airlines Flight No. 10 from Los Angeles arrived at Gate No. 11 and began deplaning passengers. As they observed people come off the plane, Investigators Flood and Bressler were positioned some fifteen feet apart in the corridor immediately outside the gate area and paid "particular attention to the physical characteristics of [an] individual, the type of clothes [an] individual [was] wearing, and any actions that he [made] which we [thought were] suspicious" (Tr. 6).

At the hearing, Investigator Flood identified the defendant as an individual he had apprehended on this occasion and described the circumstances leading to the defendant's initial detention, as follows:

"At this time the defendant—my partner, Investigator Bressler, stopped an individual who came out of the plane. As he was identifying himself to this individual the defendant came off the plane. I noticed that he was Hispanic. I noticed that his appearance was similar to other people that we had apprehended off that flight. I noticed that he was wearing a pin-striped suit and I also noticed as he came off the plane he spied Investigator Bressler identifying himself to another individual who came off the plane before the defendant. As he saw this he veered to his left, rushing by a couple of people, and began walking very fast, looking out of the corner of his eye as if waiting for Investigator Bressler to catch up with him. Investigator Bressler at the same time noticed the defendant's actions, called my name and pointed to him. As Investigator Bressler was doing this I

was already moving towards the defendant, who at this time began to walk very fast." (Tr. 8–9).

Investigator Flood testified that, suspecting that defendant was an alien, he followed customary procedure by approaching defendant to ask the latter a question in English:

"As the defendant was still walking, I asked him from where did this flight originate in English. He replied in Spanish that he didn't speak English. I then asked him—I then identified myself as a criminal investigator of the United States Immigration and Naturalization Service, and asked him [in Spanish] what country he was a citizen of." (Tr. 10)

Defendant replied that he was a citizen of Colombia. Since an alien is required to carry with him at all times evidence of his right to be in the United States (8 U.S.C. § 1304(e) (Tr. 6–7):

"I then asked him: Did he have any evidence of his right to be in the United States? He told me no. I asked him if he had any identification with him, or any papers which showed his permission to be in the United States. He then displayed to me a driver's license and social security card." (Tr. 10).[2]

Investigator Flood testified that when he saw these documents he "thought right away that they were typed with the same typewriter" (Tr. 11–12). He then asked the suspect "if he had any other papers of identification." When the suspect responded in the negative, he was placed under arrest as an illegal alien (Tr. 12).

When first approached by Investigator Flood, defendant was carrying a black suitcase made of "heavy-duty plastic" which was "bigger than a briefcase [or attache case], smaller than a large suitcase" (Tr. 23). Defendant put his suitcase on the floor when he took from his person the papers he

---

1. The numbers in parentheses (Tr. 3–5) refer to pages from the stenographic transcript of the suppression hearing held January 12, 1979.

2. It appears that the name indicated on one or both of these documents was not the defendant's real name. See Affidavit of [defense counsel] Martin Light submitted in support of motion to suppress, at 2.

showed to Investigator Flood (Tr. 26), but retained physical possession of the suitcase upon being arrested (Tr. 12). In the meantime, Investigator Bressler had arrested from the same flight two other aliens from Mexico. The INS investigators "instructed the two Mexicans and the defendant to sit in the seated area across from Gate No. 11, until all of the passengers had deplaned" (Tr. 12). While Investigator Bressler searched the two Mexicans, Investigator Flood searched defendant's person (Tr. 12 and 26). Investigator Flood testified as to what happened next:

"I asked him if he would open up the suitcase.

"Question: Did he do so?

"Answer: Yes, he did.

"Question: Did he say anything as this happened?

"Answer: No, he did not." (Tr. 12–13)

Investigator Flood then proceeded to inspect the contents of defendant's suitcase.

At the suppression hearing, Investigator Flood outlined the procedure followed by the INS with respect to the luggage of aliens apprehended under the domestic flight surveillance program:

"In the Immigration Service when we apprehend an alien he is placed in our detention facility. He has an access to his baggage. Before we can allow any baggage to go into the detention facility, we must inventory it. We inventory the baggage for several reasons: First, to make sure there is no type of weapon, or any other kind of things inside of the suitcase which can harm another individual in the detention facility, one of the officers in the detention facility, or aid in the escape of any of the aliens that are in the detention facility. In addition, we inventory all of the luggage to safeguard the alien's valuables, which may be in the suitcase, because not only does he have access to the luggage, possibly another alien could open up his baggage inside the detention facility and take a large quantity of money out or jewelry, or whatever other valuables may be inside the suitcase. These valuables are placed in a special part of the facility which are vouchered; the alien has access, but has receipts for it.

\* \* \* \* \* \*

"If an alien has luggage for which he has a baggage claim to carry it on the plane, after we have searched the aliens to make sure they have nothing on them at the terminal, the gate, we bring them out into the lobby of the airport and to a service vehicle and place them inside. We then bring the baggage claim tickets back inside where the carousels are, and claim the baggage, put them in the trunk of the service vehicle. Then we transport them to the immigration office at 26 Federal Plaza. Then we open up the baggage there for the inventory." (Tr. 13–14)

Investigator Flood explained that a different procedure is followed with respect to carry-on or hand-carried luggage which is in the possession of aliens apprehended as they deplane:

"[I]n this case, we apprehended three individuals. Usually there are only two of us on duty, as there was on this particular morning. Therefore, we have several people in custody. As we bring these people in custody out into the lobby of the airport, many times we are confronted by friends of the people that we have arrested, relatives of the people that we have arrested. Many times these people are very upset that their relatives, whom sometimes they haven't seen for quite a while have been arrested by the immigration officers. We have many incidents at the airport, because of the many people in the lobby. We have had people who tried to block our paths when we were trying to get our prisoners in the service vehicles. To enable us to be able to handle this situation, we inventory the suitcases before we go into the lobby. This is to make sure that if there is anything in the suitcase that could be used by the alien as a weapon which the alien would be carrying in his possession, and has access to, we want to make sure that we take that out. If the alien has any valua-

bles inside of his suitcase, we want to insure something does not happen in the lobby and [sic] the alien does lose his suitcase during an incident which may occur there, that we know what was in the suitcase to protect against future claims. In addition, the people who are sometimes waiting for the alien when we bring them out into that area are relatives of the detainees. Sometimes they ask if they can take the luggage for the detainee, we allow them to do this. But before they do this we want to know if there is anything valuable inside that we have a receipt for it to protect the service against future claims." (Tr. 15–16)

In the case at bar, Investigator Flood found defendant's suitcase to contain "clothes . . . two packages of money wrapped with a rubber band[3]; and . . . a small Pierre Cardin traveling bag" (Tr. 16). In cross-examination, he testified that he could not have determined by feeling the Pierre Cardin traveling bag from the outside whether or not it contained a weapon or metal object (Tr. 29–30). Upon opening the traveling bag, Investigator Flood discovered "a quantity of a white powdry substance inside a plastic bag wrapped in blue paper" (Tr. 16), which substance was subsequently tested and proved to be one half (½) kilogram of cocaine (Tr. 17). Either during an initial search of the defendant's person or during a search of his person conducted after the search of the suitcase, Investigator Flood found a "bundle of money" in the defendant's pocket (Tr. 16).

At this time, in the presence of Investigator Flood, Investigator Bressler advised defendant of his rights in Spanish and, according to Investigator Flood's uncontradicted testimony, defendant indicated that he understood his rights (Tr. 17). Mr. Flood did not say that he asked the defendant whether he was being met by friends or relatives to ascertain whether there might be any threat to his or his co-investigator's person.

The INS officers then transported the defendant and the two Mexicans out through the lobby of the airport to a service vehicle and from the airport to INS headquarters. As they proceeded down the corridor from Gate No. 11 to the airport lobby, the INS officers handcuffed the two Mexicans together and handcuffed the defendant's hands in front of him. Although the defendant continued to carry the suitcase, Investigator Flood retained custody of the money and cocaine (Tr. 26–27). There were no incidents as Investigators Flood and Bressler escorted the three arrestees through the terminal lobby (Tr. 27–28).

Upon arrival at the INS office, defendant was again advised of his rights (Tr. 17–18). At this time defendant told the investigators, *inter alia* :

"   .   .   . that he had land entered the United States on May 14, 1978 at Miami as a visitor for business; that he had received 25 days to remain in the United States, and that he had received several extensions of his stay in the United States. He also told us that he worked as a cook for a period of one month when he first arrived here at the Grand Columbiana Restaurant in Jackson Heights, at a salary of $180 per week." (Tr. 18)

Subsequent investigation revealed that defendant did enter this country on May 14, 1978, at Miami, Florida, "as a visitor for pleasure;" that he was admitted until June 5, 1978; and that he had never received any extensions of his stay (Tr. 18). As to the driver's license proffered by the defendant at the time of his initial detention, the New York State Motor Vehicle Office had "no record of any driver's license being listed for that name" (Tr. 19).[4]

Defendant has moved to suppress "evidence taken from his person on the occasion of his arrest" (Notice of Motion dated December 28, 1978). Although defendant does not specifically enumerate the items of evi-

---

3. Investigator Flood testified that the money found in defendant's suitcase amounted to $3,800.00 (Tr. 19).

4. It is unclear from the record whether or not the INS investigated the validity of the social security card proffered by the defendant (Tr. 19).

dence he believes should be suppressed, he does argue, Defendant's [Post-Hearing] Memorandum of Law in Support of Motion to Suppress (Defendant's Memorandum at 5), that "the situation at bar would not have even justified a momentary stop and investigation" and, (Defendant's Memorandum at 8), that "no probable cause or right to detain existed and that the arrest and search of the defendant herein was illegal." In any event, since the Government does not and cannot possibly argue that the search of defendant's suitcase was a border search, *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), for justification of that intrusion upon defendant's Fourth Amendment rights the Court must inquire into the basis for the investigative stop and for defendant's initial arrest as an illegal alien. The Court agrees with the attorney for the Government that defendant's detention for questioning was based upon "reasonable suspicion" and that his arrest as an alien unlawfully in this country was supported by probable cause. The Court also finds that the subsequent searches of the defendant's person and suitcase were constitutionally sound and that the evidence so obtained is admissible.

## II

### THE INVESTIGATIVE STOP AND DEFENDANT'S ARREST

In *Terry v. Ohio*, 392 U.S. 1, at 22, 88 S.Ct. 1868, at 1880, 20 L.Ed.2d 889 (1968), the seminal decision on investigative stops and searches, the Supreme Court held that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." The Supreme Court elaborated on *Terry* in *Adams v. Williams*, 407 U.S. 143, at 146, 92 S.Ct. 1921, at 1923, 32 L.Ed.2d 612 (1972), and ruled that "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time (citations omitted)." Section 287(a)(1) of the Immigration and Nationality Act, 8 U.S.C. Section 1357(a)(1), authorizes any officer or employee of the Immigration and Naturalization Service without a warrant "to interrogate any alien or person believed to be an alien as to his right to be or remain in the United States." In *United States v. Brignoni-Ponce*, 422 U.S. 873, at 877, 95 S.Ct. 2574, at 2578, 45 L.Ed.2d 607 (1975), the Supreme Court stated that "[t]here is no geographical limitation on this authority."

For purposes of applying the exclusionary rule, any detention, however brief, of a suspect by a law enforcement officer "must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures (footnote omitted)," *Terry v. Ohio, supra*, 392 U.S. at 21, 88 S.Ct. at 1879. The applicable constitutional standards have been set forth by the Supreme Court in that case. The *Terry* Court stated (392 U.S. at 21, 88 S.Ct. at 1880) that "in justifying the particular intrusion [upon the constitutionality protected interests of the private citizen] the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion (footnote omitted)," and ruled (392 U.S. at 29, 88 S.Ct. at 1884) that "evidence may not be introduced if it was discovered by means of a seizure and search which were not reasonably related in scope to the justification for their initiation (citations omitted)." In *United States v. Brignoni-Ponce, supra*, 422 U.S. at 881, 95 S.Ct. at 2580, the Court articulated a "reasonable suspicion" test, holding that "when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion." *See also, United States v. Rico*, 594 F.2d 320 (2d Cir. 1979); *United States v. Oates*, 560 F.2d 45 (2d Cir. 1977); *United States v. Magda*, 547 F.2d 756 (2d Cir. 1976), *cert. denied*, 434 U.S. 878, 98 S.Ct. 230, 54 L.Ed.2d 157 (1977); *United States v. Hall*,

174 U.S.App.D.C. 13, 525 F.2d 857 (1976); *United States v. Davis,* 147 U.S.App.D.C. 400, 458 F.2d 819 (1972).

We turn, then, to consider the "specific and articulable facts" to which Investigator Flood pointed to justify his stopping defendant for questioning. He testified at the suppression hearing that:

> "[b]ased upon information which we receive from aliens which were apprehended in the New York City area and information from confidential informants, and from intelligence reports, we realized, back in 1974, that illegal aliens were using domestic airlines to cross the United States to get to the New York City area. Since that time we have apprehended over one thousand illegal aliens deplaning domestic flights from Los Angeles." (Tr. 4–5)

In *Adams v. Williams, supra,* 407 U.S. at 147, 92 S.Ct. at 1924, the Supreme Court rejected the argument "that reasonable cause for a stop and frisk can only be based on the officer's personal observation, rather than on information supplied by another person." *See also United States v. Rico,* 594 F.2d 320 (2d Cir. 1979); *United States v. Asbury,* 586 F.2d 973 (2d Cir. 1978).

Agent Flood further testified that illegal aliens had frequently been apprehended deplaning American Airlines Flight No. 10 (Tr. 5) and that he has had over four years' experience in the domestic flight surveillance program (Tr. 3). As the Supreme Court stated in *Terry v. Ohio, supra,* 392 U.S. at 27, 88 S.Ct. at 1883, "in determining whether the officer acted reasonably . . , due weight must be given . . . to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." In *United States v. Brignoni-Ponce, supra,* the Supreme Court ruled that a roving border patrol could not rely solely on the apparent alienage of a car's occupants to justify stopping the vehicle to question them about their citizenship, but the Court also enumerated (422 U.S. at 884–885, 95 S.Ct. at 2582) some of the "factors [which] may be taken into account in deciding whether there is reasonable suspi-cion to stop a car in the border area." In language applicable to the instant case, the Court noted, *inter alia* :

> "Officers may consider the characteristics of the area in which they encounter a vehicle. Its proximity to the border, the usual patterns of traffic on the particular road, and previous experience with alien traffic are all relevant. . . . They also may consider information about recent illegal border crossings in the area."

The Second Circuit has also noted, *United States v. Magda, supra,* 547 F.2d at 758 (1976), that the circumstances confronting a law enforcement officer " 'are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training', *United States v. Hall, supra,* 174 U.S.App.D.C. at 15, 525 F.2d at 859; *cf. United States v. Wabnik,* 444 F.2d 203, 205 (2d Cir.), *cert. denied,* 404 U.S. 851, 92 S.Ct. 88, 30 L.Ed.2d 91 (1971) . . . . ."

Another factor which prompted Investigator Flood to stop the defendant was his observation that the defendant "was Hispanic" (Tr. 9). In an earlier case before this Court, *United States v. Lopez-Barajas,* 412 F.Supp. 1007 (E.D.N.Y.1976) (Platt, J.), a defendant moved to suppress physical evidence seized by Investigator Flood during a search of that defendant's person after he was apprehended as an illegal alien as he alighted from a Trans-World Airlines flight originating in Los Angeles. There we noted, in language equally applicable to the instant case (412 F.Supp. at 1011):

> " . . . *United States v. Brignoni-Ponce, supra,* is itself instructive. The United States had relied only upon defendant's apparent Mexican ancesury as justification for stopping his car. Said the Court,
>
> > 'The likelihood that any given person of Mexican ancestry is an alien is high enough to make appearance a relevant factor, but standing alone it does not justify stopping all Mexican-Americans to ask if they are aliens.' 422 U.S. at pp. 886–87, 95 S.Ct. at 2583, 45 L.Ed.2d at 619.

"Of course, in the case before us Agent Flood considered defendant's appearance, but only as 'a relevant factor'; by no means did he rely solely on defendant's appearance."

Nevertheless, the defendant at bar notes that on cross-examination Investigator Flood conceded that defendant "could pass for an Italian immigrant" or "for a person of Puerto Rican background" (Tr. 21) and argues, therefore, that the officer's observation as to defendant's apparent alienage should be entirely discounted (Defendant's Memorandum at 5–6). However, Agent Flood's suspicion that defendant was of Hispanic, rather than Italian, descent was confirmed when defendant responded in Spanish to the agent's first question as to the point of origin of Flight No. 10 (Tr. 10). Experience also informed Agent Flood that Hispanic aliens, in particular, from Central and South America booked seats on these overnight flights from Los Angeles (Tr. 5).

Defendant takes particular issue (Tr. 20–23 and Defendant's Memorandum at 4 and 6) with the inferences Investigator Flood drew from the fact that defendant was wearing a pin-striped suit as he alighted from the plane. Defendant argues (Defendant's Memorandum at 6) that "[t]o say that because a person is well dressed he can be interfered with goes against reason" and that, since "this was a Sunday night-Monday morning flight, . . . it is entirely conceivable that people would dress well because on arrival in New York they would immediately proceed to their place of business or other places of appointment." Yet, defendant would have us ignore that a law enforcement officer is to be guided by his experience and that, as indicated above, the reasonableness of his conduct is to be determined in light of that experience. *United*

*States v. Brignoni-Ponce, supra*, 422 U.S. at 885, 95 S.Ct. at 2582; *Terry v. Ohio, supra*, 392 U.S. at 27, 88 S.Ct. at 1883; *United States v. Magda, supra*, 547 F.2d at 758; *United States v. Hall, supra*, 174 U.S.App. D.C. at 15, 525 F.2d at 859. Specifically, Investigator Flood testified:

"We have found from apprehending previous aliens who come off domestic flights that many times they would wear suits just thinking that they would avoid detection. They think that immigration officers only think of aliens as being sloppily clothed. In addition, this is a night flight leaving L.A. at 10 o'clock at night, and 6 o'clock in the morning. It is unusual to see someone dressed in a suit coming off that plane. Most of the passengers dress casually on that flight." (Tr. 9–10).

In a similar case, *United States v. Lopez-Barajas, supra*, 412 F.Supp. at 1011, "[d]efendant at the hearing attempted to argue that his actions in looking for a way past the INS agent [Thomas Flood] and in attempting to return to the plane might equally be construed to be those of an innocent man looking for someone who was meeting him at the airport and of an innocent man who had forgotten a piece of luggage or clothing on the plane." This Court stated, (412 F.Supp. at 1011):

" . . . that alternative conclusions might possibly have been drawn by another is beside the point; Agent Flood *did* make a perfectly reasonable inference, and was under the law entitled to act upon it. An officer is not required to negate all possible lawful explanations of suspicious behavior before acting."

Moreover, the *Brignoni-Ponce* Court noted (422 U.S. at 885, 95 S.Ct. at 2582) that trained officers might also rely on "such factors as the mode of dress and haircut."[5]

---

5. In a border patrol context, the *Brignoni-Ponce* Court also noted (422 U.S. at 885, 95 S.Ct. at 2582):

"Aspects of the vehicle itself may justify suspicion. For instance, officers say that certain station wagons, with large compartments for fold-down seats or spare tires, are frequently used for transporting concealed aliens. (Citations omitted.)"

Surely, the use of a station wagon is *per se* no more inherently suspicious than is wearing a pin-stripe suit; however, such factors may, in light of other circumstances, assume a special significance and justify particular inferences when observed by the trained eye of a law enforcement officer.

See also, *United States v. Rico*, 594 F.2d 320 at 325 (2d Cir. 1979), and this Court's opinion in *United States v. Lopez-Barajas*, 412 F.Supp. 1007, at 1009 and 1011 (E.D.N.Y. 1976). By evaluating each factor relied upon by Agent Flood in isolation from the others, defendant ignores what the Court of Appeals for this Circuit has termed the wise admonition of the District of Columbia Circuit that "the circumstances before [the officer] are not to be dissected and viewed singly; rather they must be considered as a whole." *United States v. Hall*, 174 U.S. App.D.C. 13, at 15, 525 F.2d 857, at 859 (1976), as quoted in *United States v. Magda, supra,* 547 F.2d at 758.

Most significantly, Investigator Flood's suspicions were also aroused by his observations that when the defendant spotted Investigator Bressler identifying himself to another passenger he "veered to his left, rushing by a couple of people, and began walking very fast, looking out of the corner of his eye as if waiting for Investigator Bressler to catch up with him" and that he "began to walk very fast" as Investigator Flood moved towards him (Tr. 9). That nervous or erratic behavior in conjunction with other circumstances is a specific and articulate fact which may give rise to reasonable suspicion" requires no discussion. *United States v. Brignoni-Ponce, supra,* 422 U.S. at 884, 95 S.Ct. at 2582; *Terry v. Ohio, supra,* 392 U.S. at 23, 88 S.Ct. at 1881; *United States v. Rico,* 594 F.2d 320 at 325 (2d Cir. 1979); *United States v. Asbury,* 586 F.2d 973 at 976 (2d Cir. 1978). Defendant asserts that it is common for travellers to walk hurriedly through airports (Tr. 34–35 and Defendant's Memorandum at 6) and

defense counsel has speculated that "[i]t's possible that there were older people in front of him and defendant got around them and started to walk a bit faster" (Tr. 34). We reiterate our earlier ruling, *United States v. Lopez-Barajas, supra,* 412 F.Supp. at 1011, that "[a]n officer is not required to negate all possible lawful explanations of suspicious behavior before acting." Finally, in deciding whether or not to stop and question the defendant, Agent Flood was justified in also relying on the fact that as he moved towards the defendant Investigator Bressler also "noticed the defendant's actions, called [Agent Flood's] name and pointed to [the defendant]" (Tr. 9 and 23).

In sum, therefore, judging Agent Flood's conduct in light of the totality of the circumstances before him, this Court finds that he was able to point to specific and articulable facts on the basis of which he formed a reasonable suspicion that defendant was an illegal alien and that Agent Flood's questions to and initial stop of the defendant were reasonably related in scope to this suspicion and to the authority vested in him under Section 287(a)(1) of the Immigration and Nationality Act, *supra.* This Court further finds that, when defendant produced as identification a driver's license and a Social Security card which appeared to have been typed on the same typewriter and failed to produce any evidence of his right to be or to remain in the United States (i. e., his so-called "green card"), Agent Flood had probable cause to arrest him pursuant to Sections 264(e) and 287(a)(2) of the Immigration and Nationality Act, 8 U.S.C. §§ 1304(e) and 1357(a)(2).[6]

---

6. Section 1304(e) of Title 8, U.S.C. provides as follows:

"Every alien, eighteen years of age and over, shall at all times carry with him and have in his personal possession any certificate of alien registration or alien registration receipt card issued to him pursuant to subsection (d) of this section. Any alien who fails to comply with the provisions of this subsection shall be guilty of a misdemeanor and shall upon conviction for each offense be fined not to exceed $100 or be imprisoned not more than thirty days, or both."

Section 1357(a)(2) of Title 8, U.S.C. provides:

"(a) Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

\* \* \* \* \* \*

"(2) to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, or expulsion of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is

*United States v. Rico,* 594 F.2d 320 at 326–27 (2d Cir. 1979).

## III

## THE SEARCH OF DEFENDANT'S PERSON AND SUITCASE

■ The Court turns to consider, in light of its finding that defendant's stop, questioning and arrest were in fact lawful, whether the "pat down" or frisk of defendant's person and the warrantless inspection at the airport by Inspector Flood of the contents of defendant's suitcase were constitutionally permissible searches. There is no question in our mind that the on-the-spot search of defendant's person was perfectly proper as a search incident to a lawful arrest and the bundle of money seized in connection therewith will be admissible at trial. *United States v. Chadwick,* 433 U.S. 1, at 14, 97 S.Ct. 2476, at 2485, 53 L.Ed.2d 538 (1977); *United States v. Robinson,* 414 U.S. 218, at 224, 94 S.Ct. 467, at 471–473, 38 L.Ed.2d 427 (1973); *Adams v. Williams,* 407 U.S. 143, at 149, 92 S.Ct. 1921, at 1925, 32 L.Ed.2d 612 (1972); *Chimel v. California,* 395 U.S. 752, at 763, 89 S.Ct. 2034, at 2040, 23 L.Ed.2d 685 (1969).

The testimony presented at the January 12, 1979 suppression hearing as well as the memoranda of law submitted by both sides focused on the search of defendant's suitcase during which Agent Flood discovered two bundles of money totalling three thousand and eight hundred dollars ($3,800.00) and one half (½) kilogram of cocaine. Counsel for the United States asserts that this search conducted without a warrant can be justified as a search for documents pertaining to alienage, as a weapons search, as a consent search, or as an inventory search.

■ Citing as authority only the Supreme Court's decision in *Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960), the Government argues that

"the search of defendant's hand-carried suitcase can easily be justified as a reasonable search for documents pertaining to alienage . . . ." (Government's Memorandum of Law in Opposition to Motion to Suppress ("Government's Memorandum") at 19). In *Abel, supra,* 362 U.S. at 236, 80 S.Ct. at 695–696, the Court concluded that there is no "constitutional reason to limit the search for materials proving the deportability of an alien, when validly arrested, more severely than we limit the search for materials probative of crime when a valid criminal arrest is made" and "that government officers who effect a deportation arrest have a right of incidental search analogous to the search permitted criminal law-enforcement officers." However, no evidence whatsoever was presented at the suppression hearing to suggest that the contents of defendant's suitcase were inspected for the purpose of uncovering evidence of defendant's status, and a warrantless search and seizure cannot be justified on the basis of argument or speculation as to what a law enforcement officer's motive or grounds for the intrusion could have been. Moreover, the substantive developments in the field of constitutional law, and in particular over the past decade with respect to searches and seizures, may well undermine the precedential value of the *Abel* opinion, at least insofar as its applicability to the facts of the instant case is concerned.

Indeed, the questions concerning the continuing validity of the *Abel* opinion are most evident in its application to the facts of that case of the principles governing weapons searches. In *Abel, supra,* 362 U.S. at 223, 80 S.Ct. at 689, federal agents knocked on the door of the suspect's hotel room and pushed open the door when the suspect released the catch. The suspect, who was nude at the time, was told to and did put on a pair of undershorts and sit on the bed. Although the suspect had not yet been placed under arrest, the Court justified a fifteen to twenty minute "search of

likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service

having authority to examine aliens as to their right to enter or remain in the United States . . . ."

his person and of all of his belongings in the room, and the adjoining bathroom" as, *inter alia,* a valid search for weapons. Yet, in *Terry v. Ohio, supra,* wherein the far milder intrusion of a "pat down" search of a suspect's person was scrutinized the Supreme Court held, 392 U.S. at 27, 88 S.Ct. at 1883, that in determining "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger" a court must examine the specific and articulable facts which prompted the search.

The situation changes once the stop for questioning, prompted by a reasonable suspicion, establishes probable cause for an arrest and the suspect is placed under arrest. As the Supreme Court has recently held in *United States v. Chadwick,* 433 U.S. 1, at 14–15, 97 S.Ct. 2476, at 2485, 53 L.Ed.2d 538 (1977):

"When a custodial arrest is made, there is always some danger that the person arrested may seek to use a weapon, or that evidence may be concealed or destroyed. To safeguard himself and others, and to prevent the loss of evidence, it has been held reasonable for the arresting officer to conduct a prompt, warrantless, 'search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.' *Chimel v. California,* 395 U.S., at 763, 89 S.Ct. 2034. See also *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

"Such searches may be conducted without a warrant, and they may also be made whether or not there is probable cause to believe that the person arrested may have a weapon or is about to destroy evidence. The potential dangers lurking in all custodial arrests make warrantless searches of items within the 'immediate control' area reasonable without requiring the arresting officer to calculate the probability that weapons or destructible evidence may be involved. *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Terry v. Ohio, supra.*

However, warrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest either if the 'search is remote in time or place from the arrest,' *Preston v. United States,* 376 U.S. [364], at 367, 84 S.Ct. 881, 11 L.Ed.2d 777, or no exigency exists. Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest.[9] "

"[9] Of course, there may be other justifications for a warrantless search of luggage taken from a suspect at the time of his arrest; for example, if officers have reason to believe that luggage contains some immediately dangerous instrumentality, such as explosives, it would be foolhardy to transport it to the station house without opening the luggage and disarming the weapon. *See, e. g., United States v. Johnson,* 467 F.2d 630, 639 (CA 2 1972)."

Applying the aforementioned principles to the facts of the case at bar, this Court finds that, while Agent Flood had probable cause to arrest the defendant as an illegal alien, he had no reason to believe that the defendant had in his possession any weapon or other dangerous instrumentality. Apparently conceding as much, the United States Attorney argues (Government's Supplemental Memorandum in Opposition to Motion to Suppress at 11–12) that the law does not require that Agent Flood have had probable cause to believe or even a reasonable suspicion that the defendant was armed since Agent Flood already had probable cause to place him under arrest and since the hand-carried suitcase remained in defendant's "immediate control" within the meaning of *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

In this Court's view, the Government's point is well taken. *United States v. Robinson,* 414 U.S. 218, at 228 and 234, 94 S.Ct., at 473 and 476, 38 L.Ed.2d 427 (1973). See *People v. DeSantis,* 46 N.Y.2d 82, 412 N.Y. S.2d 838, 385 N.E.2d 577 (1978). There is

nothing in the record to show that the defendant at any time surrendered the suitcase to the custody or control of the INS Officers. Indeed, as Agent Flood testified on cross-examination, defendant placed the suitcase on the floor when he tendered the driver's license and Social Security card, but the agent did not pick up the suitcase because he did not yet have probable cause to arrest (Tr. 26). From all that appears, defendant retained possession of the suitcase at the time of his arrest and opened it at Agent Flood's request. Under *Chimel, supra,* the suitcase was still in the defendant's immediate control" and for their own protection they were authorized to inspect the same ("without a warrant" and "whether or not there is probable cause to believe that the person arrested may have a weapon") to ensure their own safety and the safety of all others in the immediate area. In other words, an "exigency" under *Chadwick* did exist and the arresting officer was not required "to calculate the probability that weapons or destructible evidence might be involved" and his request and inspection were perfectly proper and warranted. Specifically, on cross-examination, INS Officer Flood was asked "[whether] the reason [he] inventoried it at that point [i. e., at arrest] rather than at the Federal Plaza where you do the other checking of the luggage was in case there was anything harmful or dangerous in the suitcase" to which he replied: "That's one of the reasons, yes, sir" (Tr. 28–29). Moreover, Investigators Flood and Bressler were not required under such circumstances to attempt to separate the luggage from the defendant with any and all risks that might be attendant thereon. In short, they acted prudently, cautiously and with full respect for the defendant's rights and their own and others' safety when they asked him to open his suitcase and reveal its contents.

In light of our decision on this point, it is not necessary at this juncture to reach the more troublesome questions of whether the defendant's consent was knowledgeable and voluntary and/or whether the INS officer's search was constitutionally valid as a routine inventory search under the facts and circumstances of this case.

Accordingly, for the reasons set forth above, defendant's motion to suppress must be, and the same hereby is, denied in all respects.

SO ORDERED.